**AMERICAN POSTAL WORKERS UNION, AFL–CIO, et al.,
Appellants,**

v.

**UNITED STATES POSTAL SERVICE, Appellee.**

No. 88–5436.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 19, 1989.

Decided Dec. 8, 1989.

As Amended Dec. 8, 1989.

---

Keith E. Secular, New York City, with whom Anton G. Hajjar, Washington, D.C., was on brief, for appellants.

Wilma A. Lewis, Asst. U.S. Atty. with whom Jay B. Stephens, U.S. Atty., John D. Bates, R. Craig Lawrence, Asst. U.S. Attys. and Charles D. Hawley, Atty., Washington, D.C., U.S. Postal Service were on brief, for appellee.

Before WALD, Chief Judge, and MIKVA and RUTH BADER GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge MIKVA.

Concurring opinion filed by Circuit Judge RUTH BADER GINSBURG.

MIKVA, Circuit Judge:

Appellants in this action challenge the district court's grant of summary judgment for the United States Postal Service ("USPS" or "Postal Service"). The district court found that appellants lacked standing to seek review of a final order of the USPS which suspended the Postal Service's statutory monopoly to allow private entities to participate in a mail delivery market known as international remailing. On the merits, the district court concluded that the USPS did not act arbitrarily, capriciously or beyond its statutory authority in promulgating the international remailing regulation. Appellants, the American Postal Workers Union, AFL–CIO and the National Association of Letter Carriers, AFL–CIO (collectively, "the Unions") assert that they are within the "zone of interests" implicated by the Private Express Statutes ("PES")—the statutes codifying the Postal Service's historic monopoly on the carriage of letters over postal routes. The Unions challenge the USPS's wholesale suspension of the international remailing restriction as arbitrary, capricious and not supported by a sufficient factual showing that the "public interest" required such suspension.

We agree. The district court correctly concluded that the Unions satisfy the requisites for article III standing. We find, however, that the district court erred in concluding that the Unions' interest in preserving employment opportunities bears no reasonable relationship to the purposes of the PES. Because the Private Express Statutes are an integral part of a comprehensive statutory scheme which clearly addresses the welfare and employment of postal employees, we conclude that the Unions are within the zone of interests of the PES. The USPS's suspension of the PES to allow unrestricted international remailing by private entities constitutes arbitrary and capricious agency action because the USPS did not develop a record to project the impact of the suspension on uniform postal rates and service. Consequently, we remand this case to the district court to vacate its order and allow the USPS to reopen its proceedings or take other action consistent with this opinion.

## I. BACKGROUND

The Private Express Statutes historically have granted to the USPS a monopoly over the carriage of letters by prohibiting, with certain exceptions, private competition in conveying letters over postal routes. *See* 18 U.S.C. §§ 1693–1699, 1729 (1982); 39 U.S.C. §§ 601–606 (1982). The USPS may "suspend [the Private Express restrictions] upon any mail route where the public interest requires the suspension." 39 U.S.C. § 601(b). In 1979, the Postal Service exercised its authority under § 601(b) to suspend the PES for the carriage of extremely urgent letters, otherwise known as express mail or overnight service. *See* 44 Fed.Reg. 61,181 (Oct. 24, 1979). As a result, private mail services began to rely on the urgent letter suspension to support the practice of "international remailing," or carriage of letters overseas for deposit into foreign postal systems—thus allowing users of this service to bypass completely the U.S. Postal Service. In October of 1985, the USPS announced its intention to amend the urgent letter suspension to limit sharply its applicability to international remailing. *See* 50 Fed.Reg. 41,462 (Oct. 10, 1985). This proposal was greeted with massive opposition from the business community and the disapproval of several members of Congress and senior executives in the Reagan Administration. Opponents argued primarily that preventing private remailers from offering inexpensive, speedy service would jeopardize the ability of American companies to compete for business abroad.

In March of 1986, the Chairman of the Postal Service's Board of Governors, John McKean, announced the USPS's intention to initiate another rulemaking proceeding "to remove the cloud that now hangs over

the international remail services and preserve the benefits of desirable competition between the Postal Service and private companies." The USPS withdrew its earlier proposal and began considering whether to suspend the PES to allow international remailing. *See* 51 Fed.Reg. 9652 (March 21, 1986). Two rulemaking notices to this effect and a public meeting produced little additional factual information.

On August 20, 1986, the USPS published a final rule suspending the PES to permit unrestricted international remailing. *See* 51 Fed.Reg. 29,636. The regulation allows private carriers to deliver mail from the United States directly to foreign postal systems, bypassing the USPS, without meeting certain cost conditions that applied under the urgent letter suspension. *See* 39 CFR § 320.8 (1988). Responding to the Unions' complaint that the record was inadequate to support a "public interest" finding, the USPS stated:

> The Postal Service ... sought ... to obtain precise and detailed information regarding the level of services provided by remailers, and the benefits which [their] customers ... derive. It may well be, however, that because of the diverse character of the remail industry and the relatively recent development of remailing, the comprehensive information we had hoped to receive to supplement the essentially anecdotal information, which was furnished to us, is not available. Nonetheless, the Postal Service has compiled a record which appears to demonstrate the existence of a public benefit and to support the suspension.

51 Fed.Reg. 29,637 (Aug. 20, 1986). Indeed, in its final notice of proposed rulemaking the USPS had emphasized the sketchy nature of the factual record, referring to the "anecdotal character" of tables charting relative delivery times, the "imprecision of the data" on the need of U.S. businesses for private international remailing, and the presence of "little or no reliable information as to the amount of revenues diverted to date by the activities of remailers." 51 Fed.Reg. 21,931 (June 17, 1986).

The Unions filed suit in the district court, seeking declaratory and injunctive relief against enforcement of the international remailing regulation. The district courts have original jurisdiction over suits by or against the Postal Service. 39 U.S.C. § 409 (1982). Although the USPS is exempt from the strictures of the Administrative Procedure Act ("APA"), *see* 39 U.S.C. § 410(a), it has chosen to follow APA procedures when promulgating rules affecting the PES. *See* 39 CFR § 310.7 (1988). Therefore, the APA provides the appropriate standards for evaluating the procedural and substantive issues in this case.

Issuing a memorandum opinion, the district court granted the Postal Service's motion for summary judgment. Because the suspension threatened workers with the prospect of reduced employment opportunities, the court found that the Unions met the constitutional requirements for standing under Article III. The court concluded, however, that the Unions were not within the zone of interests implicated by the PES. Applying *Clarke v. Securities Industry Association,* 479 U.S. 388, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987), the court reasoned that the Unions' interests bore no reasonable relationship to the purposes of the PES because those statutes were "designed to ensure only that the Service maintains sufficient revenue to be able to provide efficient and effective mail delivery services to all aspects of the market." In addition, the court asserted that, in certain circumstances, the interests of the Unions might diverge from the purposes of the PES because Congress, in enacting the "public interest" exception, recognized that there might be situations in which the revenue objectives of the PES could be achieved without the benefit of a monopoly. Finally, the court concluded that a finding of standing in this case implicitly would afford standing "to *any* agency employee whose job or employment opportunities were threatened as a result of an agency decision."

On the issue of statutory authority, the court reasoned that the "public interest requires" language of § 601(b) conferred broad discretion on the Postal Service "to

define the public interest in a given situation and to act accordingly." The court concluded that the suspension decision was made on a reasoned basis, rejecting the charge that the evidence was inadequate. While the court acknowledged "the relative dearth of empirical data" in the record, it relied upon court precedents which upheld agency decisions lacking factually specific support. *See, e.g., FCC v. National Citizens Committee for Broadcasting,* 436 U.S. 775, 813–14, 98 S.Ct. 2096, 2121, 56 L.Ed.2d 697 (1978) (factual specificity not always required where "a forecast of the direction in which future public interest lies necessarily involves deductions based upon the expert knowledge of the agency").

## II. ANALYSIS

### A. *Standing*

■ The law of standing is based on a set of constitutional and prudential requirements. To establish standing under article III of the Constitution a litigant must plead an injury in fact fairly traceable to the conduct complained of and likely to be redressed by the relief requested. *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). Prudential standing requires that the "plaintiff's complaint fall within 'the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.'" *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 474–75, 102 S.Ct. 752, 760, 70 L.Ed.2d 700 (1982) (quoting *Association of Data Processing Serv. Orgs., Inc. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970)) (footnote omitted). That the Unions satisfy the constitutional requirements for standing is not in doubt. Allowing private international remailers to compete directly with the Postal Service threatens postal workers with the prospect of reduced employment opportunities. *See, e.g., American Postal Workers v. React Postal Services, Inc.,* 771 F.2d 1375, 1380 (10th Cir.1985) ("[W]henever a private entity is allowed to perform the tasks of collection, sortation, delivery, etc. in competition with the USPS, the em-

ployment opportunities of the postal workers are inevitably reduced."). Such threatened injury is sufficient to satisfy the "injury in fact" prong of the test for article III standing. *See Valley Forge,* 454 U.S. at 472, 102 S.Ct. at 758.

■ At issue in this case is whether the Unions' interest in retaining employment opportunities satisfies the "zone of interests" test as iterated by the Supreme Court in *Clarke v. Securities Industry Association,* 479 U.S. 388, 399–400, 107 S.Ct. 750, 757, 93 L.Ed.2d 757 (1987). The Unions' cause of action derives from § 702 of the APA, which grants standing to a person "aggrieved by agency action within the meaning of the relevant statute." 5 U.S.C. § 702 (1982). In *Clarke,* the most recent instruction from the Supreme Court on the subject, the Court acknowledged that the zone of interests test is a gloss on § 702 of the APA that provides some limits on access to the courts. The *Clarke* Court, however, in several places admonished this circuit and others in general for a somewhat parsimonious approach to the law of prudential standing, stating that "there need be no indication of a congressional purpose to benefit the would-be plaintiff." 479 U.S. at 399–400 & n. 15, 107 S.Ct. at 757 & n. 15. Again, the Court asserted that the test "is not meant to be especially demanding," and that there need be only "a plausible relationship" between the interests propounded by the plaintiff and the policies undergirding the statutory framework. Pp. 396, 399, 403, 107 S.Ct. pp. 755, 757, 759. Finally, the Court reaffirmed an established presumption in favor of judicial review. Would-be plaintiffs should be allowed into courts unless they are *"not even 'arguably within the zone of interests to be protected or regulated by the statute.'"* P. 397, 107 S.Ct. p. 756 (emphasis added, citation omitted). This presumption would seem to operate with particular favor for those plaintiffs that satisfy the constitutional requirements for standing.

As the *Clarke* Court explained, the zone of interests test serves as our guide for deciding whether "in view of Congress' evident intent to make agency action presump-

tively reviewable, a particular plaintiff should be heard to complain of a particular agency action." P. 399, 107 S.Ct. p. 757. In cases such as this, where the would-be plaintiff is not the subject of the contested regulation, the test denies standing only if "the plaintiff's interests are so *marginally related* to or *inconsistent* with the purposes *implicit* in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." P. 399, 107 p. 757. (emphasis added).

■ Turning to the circumstances of this case, we are easily convinced that the Unions' concerns have more than a "marginal" relationship to the purposes implicit in the PES. The district court erred in focusing too narrowly on the functions of the PES in isolation from the entire Postal Reorganization Act of 1970 ("PRA"), of which the PES are a part. When attempting to discern the scope of interests embraced by a particular legislative provision, courts may look to the purposes animating the entire statutory framework. *See Clarke*, 479 U.S. at 401, 107 S.Ct. at 757 ("[W]e are not limited to considering the statute under which respondents sued, but may consider any provision that helps us to understand Congress' overall purposes in the National Bank Act."); *Association of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 157 & n. 2, 90 S.Ct. 827, 831–32 & n. 2, 25 L.Ed.2d 184 (1970); *see also National Coal Association v. Hodel*, 825 F.2d 523, 529 (D.C.Cir.1987) (looking beyond the Federal Land Policy and Management Act of 1976 (FLPMA) to other legislation aimed at the coal industry in order to "flesh out the meaning of the term 'public interest'" in the FLPMA); *Wilderness Society v. Griles*, 824 F.2d 4, 18 n. 11 (D.C.Cir.1987) ("Thus, plaintiffs ... appear to fall within the zone of interests of the statutory scheme represented by three complementary enactments.").

This court's approach in *National Coal Association* is instructive. In that case, § 206 of the FLPMA authorized the Secretary of the Interior to dispose of public lands by exchange where "the public interest" would be well served. In order to

"flesh out" the meaning of the term "public interest" for prudential standing purposes, the court looked not only to the language and purposes of the FLPMA but also to the concerns informing separate legislation having related objectives. *National Coal Ass'n*, 825 F.2d at 529.

An examination of the function of the PES in advancing the goals of the entire PRA demonstrates the relevance of the PRA to our zone of interests inquiry. The PRA revamped the nation's postal system, rendering the Postal Service politically independent by endowing it with financial and budgetary authority previously confided in Congress. In enacting the PRA, Congress incorporated without substantive modification private express provisions which originate from a statute passed in 1792, when Congress first embraced the concept of a postal monopoly. *See* Act of Feb. 20, 1792, ch. 7, § 14, 1 Stat. 236. In Section 7 of the PRA, Congress directed the new Postal Service to reevaluate the PES and report on the continuing need for a postal monopoly. In 1973, the Board of Governors submitted the requested report, concluding that "the basic protections of the Private Express Statutes must be retained if this country is to continue to have effective universal mail service reaching into every community and serving all parts of the nation." Board of Governors, *Statutes Restricting Private Carriage of Mail and Their Administration*, Comm. Print No. 93–5, 93d Cong., 1st Sess. 1 (June 29, 1973). Thus, the PES, which continue the postal monopoly, play a pivotal role in achieving an important purpose of the PRA: to "provide prompt, reliable, and efficient services to patrons in all areas and ... render postal services to all communities." 39 U.S.C. § 101.

A key impetus for the PRA appears to have been a nationwide work stoppage by postal employees which occurred in March, 1970. *See* H.R.Rep. No. 1104, 91st Cong., 2d Sess. 3 (1970), U.S.Code Cong. & Admin. News 1970, p. 3649. Therefore, a principal purpose of the PRA was to implement various labor reforms that would improve pay, working conditions and labor-management relations for postal employees. *See id.* at

2–4, 13–14. The Postal Service asserts that the other statutory provisions of the PRA should be looked to only if they bear some relationship to the purposes of the PES. Yet, to assess whether the Unions fall within the zone of interests of the PES we need not create nice distinctions between the PES and the PRA where Congress itself did not. As the *Clarke* Court made clear, the presumption in favor of judicial review is overcome only when "congressional intent to preclude judicial review is 'fairly discernible in the statutory scheme.'" 479 U.S. at 399, 107 S.Ct. at 757 (quoting *Data Processing*, 397 U.S. at 157, 90 S.Ct. at 832). The legislative history of the PRA leads inexorably to the opposite conclusion. The Unions' asserted interest is embraced directly by the labor reform provisions of the PRA. The PES constitute the linchpin in a statutory scheme concerned with maintaining an effective, financially viable Postal Service. The interplay between the PES and the entire PRA persuades us that there is an "arguable" or "plausible" relationship between the purposes of the PES and the interests of the Union.

We are equally convinced that the revenue protective purposes of the PES, standing alone, plausibly relate to the Unions' interest in preventing the reduction of employment opportunities. The PES were designed specifically to prevent private mail services from "cream-skimming" the most profitable mail services by undercutting the Postal Service on low cost, high-profit routes, thereby leaving the Service with less revenue to fulfill the requirement of providing service throughout the nation at uniform rates. Doc. No. 1, 28th Congress, 1st Sess. 596 *et seq.* (December 2, 1843), *quoted in* J. Haldi, *Postal Monopoly: An Assessment of the Private Express Statutes* 9 (1974); 39 U.S.C. § 101, § 3623(d); *see also Regents of the Univ. of California v. Public Employment Bd.*, 485 U.S. 589, 108 S.Ct. 1404, 1408, 99 L.Ed.2d 664 (1988) ("Because Congress desires 'prompt, reliable, and efficient services to [postal] patrons in *all* areas,' it has enacted the Private Express Statutes and has provided for nationwide delivery of mail at uniform rates.") (citations omitted). As stated above, congressional intent to benefit the Unions is not required. That postal workers benefit from the PES's function in ensuring a sufficient revenue base, however, is scarcely deniable. Thus the Unions' interests arguably are within the zone of interests contemplated by the PES even when considered in isolation. The district court's reasoning that there may be circumstances in which the interests of the Unions will diverge from the purposes of the PES, exacts too demanding a standard for meeting the zone of interests test. The relationship of the plaintiff to the statute need only be arguable, not wholly coincident. Instead of requiring an *a priori* showing that no conflicts could possibly ensue from a grant of standing, the zone of interests inquiry only "seeks to exclude those plaintiffs whose suits are more likely to frustrate than to further statutory objectives." *Clarke*, 479 U.S. at 397 n. 12, 107 S.Ct. at 756 n. 12.

The PES reflect a congressional presumption that a postal monopoly will be maintained to the extent necessary to ensure universal service at uniform postal rates. Hence the Unions would seem to be appropriate plaintiffs to vindicate Congress' intent that the USPS reduce the scope of this monopoly only when clearly required by the public interest. This reasoning accords with an earlier decision of this circuit which found a union to be an appropriate challenger of agency action involving a statutory guarantee of a domestic monopoly. *See Autolog Corporation v. Regan*, 731 F.2d 25, 30 (D.C.Cir.1984) (union representing American seamen was within the zone of interests of the coastwise laws which create a monopoly for domestic shippers, because such laws protect the livelihood of union members). Similarly, an association representing the interests of business owners licensed to operate in a particular industry is within the zone of interests of a law that restricts entry of would-be competitors into that industry. *See Panhandle Producers and Royalty Owners Association v. Economic Regulatory Administration*, 822 F.2d 1105, 1109

(D.C.Cir.1987) ("[O]ne need not be a cynic to understand competitors' success in seeking to enforce licensing barriers: their interests are generally congruent with a statutory purpose to restrict entry.").

We emphasize that this case is in a different genre from *National Federation of Federal Employees v. Cheney*, 883 F.2d 1038 (D.C.Cir.1989). In that case a union contested a United States Army decision to "contract out" to private contractors the services previously provided by federal employees at the Directorate of Logistics in Fort Sill, Oklahoma. The majority found that the union did not fall within the zone of interests of any of the three statutory schemes at issue, either because the legislative history of the statute did not indicate "that Congress contemplated in-house federal employees or federal employee labor unions" as a particular class of plaintiffs to be relied upon to challenge agency disregard of the law, *id.* at 1044, or because the interest asserted by the union was antithetical to the pro-competitive objectives of the statute. *Id.* at 22, 25, 1048, 1050. In contrast, the legislative history of the PRA reveals a clearly expressed concern for the welfare and employment conditions of postal workers. More importantly, the PRA codified a postal monopoly dating back to the late eighteenth century. Unlike the contracting-out provisions at issue in *NFFE v. Cheney*, the presumption established by the PES is against allowing private competition. For this reason the Unions' interests are largely congruent with the purposes of the PES.

In light of the special emphasis which the PRA places on the welfare of postal employees and the unique role of the PES in maintaining the financial viability of the Postal Service, we must reject the district court's conclusion that affording standing in this case implicitly would grant standing under § 702 to any agency employee whose employment opportunities were threatened as a result of an agency decision. We recognize that agencies frequently face decisions which could result in reduced employment opportunities for their employees. The Postal Service, however, is charged with the responsibility of preventing unwarranted dissipation of an historic postal monopoly. Congress has imposed an obligation, largely congruent with the interests of postal employees, that is much stronger than those embodied in most statutory schemes under which disgruntled agency employees might sue. Contrary to the district court's implication, "standing is not to be denied simply because many people suffer the same injury." *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 687, 93 S.Ct. 2405, 2416, 37 L.Ed.2d 254 (1973).

The Unions alternatively claim standing as users of the mails. Because we find that their interest in retaining employment opportunities falls within the zone of interests of the PES, we need not resolve this claim.

## B. *The Merits*

The USPS's decision to suspend completely the PES with respect to international remailing rests chiefly on its finding that this would benefit American businesses by providing them with faster, cheaper service—thereby enhancing their ability to compete in international markets. In its notice of final rulemaking, the USPS conceded that much of the evidence in support of these benefits was testimonial in nature, but the Service was persuaded by the virtual unanimity of the comments offered by businesses using the services of private remailers. *See* 51 Fed.Reg. at 29,637 (Aug. 20, 1986). Although the USPS did not discuss revenue impact in its final notice, it did conclude in an earlier notice of the proposed suspension that the total potential loss of revenues—$882 million, representing all revenues from international mail in 1985—would not be "so adverse to the Postal Service as to outweigh allowing remailing to continue by virtue of the [proposed] suspension." 51 Fed.Reg. at 21,931 (June 17, 1986).

The Unions offer three core arguments to challenge this rulemaking as arbitrary and capricious. First, they contend that none of the factors relied upon by the Postal Service represents a legitimate rationale for suspending the PES. Second, they

aver that the alleged benefits are not supported by concrete evidence in the record. Third, they argue that the Postal Service rejected without explanation more "tightly drawn and narrowly restricted" alternatives in favor of the broadest possible suspension, permitting all forms of international remailing.

The scope of judicial review of agency action for arbitrariness and caprice is narrow. A reviewing court cannot substitute its judgment for that of the agency. *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983). In order to guard against agency inferences that are "arbitrary," however, the court must engage in a "thorough, probing, in-depth review" of the agency's asserted basis for decision, ensuring that "the agency ... [has] examine[d] the relevant data and [has] articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choices made.'" *Id.* (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962)).

■ Our task is rendered more difficult in this case by the sweeping nature of the "public interest requires" standard for justifying suspensions. The district court reasoned, and the Postal Service echoes, that by using this language in § 601(b), Congress vested the Service with the discretion to "define the public interest in a given situation and to act accordingly." While this appears to be the first occasion in which an appellate court has interpreted § 601(b) in this context, we are not without the guidance of numerous court opinions interpreting similar "public interest" language often used by Congress in giving regulatory agencies their marching orders. *See, e.g., Central Southern Motor Freight Tariff Ass'n v. United States*, 757 F.2d 301, 314–15 (D.C.Cir.), *cert. denied*, 474 U.S. 1019, 106 S.Ct. 568, 88 L.Ed.2d 553 (1985) (describing the Interstate Commerce Commission's broad authority to allow certain exemptions when in the "public interest" as "a congressional charge to 'go

forth and do good'"). The district court relied on a single Supreme Court case, *FCC v. WNCN Listeners Guild*, which held that the "public interest, convenience, and necessity" standard governing the FCC's licensing authority conferred broad discretion on that agency to implement its view of the public interest standard "'so long as that view is based on consideration of permissible factors and is otherwise reasonable.'" 450 U.S. 582, 593–94, 101 S.Ct. 1266, 1273–74, 67 L.Ed.2d 521 (1981) (quoting *FCC v. National Citizens Committee for Broadcasting*, 436 U.S. 775, 98 S.Ct. 2096, 56 L.Ed.2d 697 (1978)). Yet, as the preceding passage shows, a "public interest" standard does not confer *unfettered* discretion on the agency administering it.

As in *WNCN Listeners Guild*, the term "public interest" is not defined in the Private Express Statutes. We have no doubt that Congress intended to confer a substantial degree of discretion on the USPS. The scope of that discretion is a matter of statutory interpretation. In the "pre-*Chevron*" era the Supreme Court stated that "the use of the words 'public interest' in a regulatory statute is not a broad license to promote the general public welfare. Rather, the words take meaning from the purpose of the regulatory legislation." *NAACP v. FPC*, 425 U.S. 662, 669, 96 S.Ct. 1806, 1811, 48 L.Ed.2d 284 (1976). In *Chevron USA, Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), the Supreme Court clarified the standard of review applicable to an agency's interpretation of the statutes it administers. This court has aptly summarized the *Chevron* analytical framework:

> We first examine the text of the implicated statute and, where appropriate, its legislative history; using traditional tools of statutory construction, we seek to determine whether and how Congress resolved specific issues of law raised in the proceeding under review, and confine the agency to consistency with Congress' intent. If we find that Congress did not clearly resolve those issues, however, we must accept the agency's interpretation

*so long as it is reasonable—i.e., "rational and consistent with the statute."* Midtec Paper Corporation v. United States, 857 F.2d 1487, 1496–97 (D.C.Cir. 1988) (citing *NLRB v. United Food & Commercial Workers Union, Local 23*, 484 U.S. 112, 108 S.Ct. 413, 421, 98 L.Ed.2d 429 (1987); *Chevron*, 467 U.S. at 842–45, 104 S.Ct. at 2781–82) (emphasis added). In cases such as this, where Congress has assigned broad authority to an agency— specifying only that a non-defined "public interest" requires agency action—this court has applied the second prong of the *Chevron* analysis, upholding agency interpretations where reasonable. In our view, *Chevron* reasonableness review of an agency's interpretation of a "public interest" standard is not empty rhetoric; it is intended to have a limiting effect on the range of agency discretion. *See, e.g., Midtec Paper*, 857 F.2d at 1500 ("In order to support its exercise of discretion, the agency must provide a reasoned analysis that is not manifestly contrary to the purposes of the legislation it administers."); *Central & Southern Motor Freight*, 757 F.2d at 321 ("[E]xceptions to a statute are not to be construed in such a manner that they 'defeat rather than further the purpose of Congress.'").

■ Although we recognize the broad discretion conferred upon the agency, we believe that its apparently narrow interpretation of the "public interest" in this case frustrates the core purpose of the PES. The Postal Service considered only the benefits which apparently would redound to a single segment of the Service's consuming public: businesses engaged in commerce overseas. In the context of the purposes of the PES, the USPS also should have considered the impact of the proposed suspension on those consumers who would continue to use the Postal Service, both from a price and service perspective. Indeed, as stated above, the fundamental purpose of the PES is to prevent private competitors from "cream-skimming" profitable routes, thereby providing the Postal Service with sufficient revenue to fulfill its mandate of providing service throughout the nation and at uniform rates. The USPS's interpretation of the "public interest" is not reasonable because it did not give sufficient attention to how revenue losses might affect cost and service of other postal patrons.

The USPS's own analysis in accepting the urgent letter suspension supports our reasoning. The Service limited that suspension to mails meeting prescribed "loss of value" or "cost" conditions because

[t]his [measure] is designed to protect the postal system against the inroads or "cream-skimming" by private couriers solely on the basis of their ability to undercut postal rates selectively. It is intended to test whether the shipper looks to a private carrier because he genuinely attaches an importance to prompt delivery, or simply because he desires to reduce shipping costs selectively. *If selective cost savings were sufficient grounds to use a private courier to carry letters, the Private Express Statutes would be effectively nullified.*

44 Fed.Reg. 40,076 (July 9, 1979) (emphasis added). Despite the soundness of this reasoning, the USPS proceeded in this case to ignore it, indeed to contravene it directly, by justifying an unqualified suspension solely on the selective cost and service benefits to businesses engaged in international commerce. This approach is unreasonable, arbitrary and capricious. *Cf. Clark–Cowlitz Joint Operating Agency v. FERC*, 826 F.2d 1074, 1091–92 (D.C.Cir.1987), *cert. denied*, 485 U.S. 913, 108 S.Ct. 1088, 99 L.Ed.2d 247 (1988) (holding that agency administering a "public interest" standard did not engage in reasoned decisionmaking when it focused only on the economic impacts accruing to one segment of the power consuming public).

The Postal Service replies that it did consider revenue impact by factoring into its analysis (although not in its final rulemaking) an estimate of the total potential loss of revenue from an unrestricted international remailing suspension. Again, the only public "impact" which the Service assessed was the selective cost savings and service benefits to the business sector.

Given that such selective evidence is not, without more, a sufficient justification for a suspension, a cursory, lump-sum analysis of the potential revenue loss hardly amounts to a reasoned assessment of the impact on uniform postal rates and service. Such tepid reasoning makes it impossible for this court to discern whether the suspension is indeed reasonable or consistent with the purposes of the PES. The Unions argue, for example, that international mail rates have increased substantially as a result of the "skimming" of volume of international remailers (pursuant to the urgent letter suspension). Yet no analysis even approaching such specificity was undertaken by the Postal Service in its rulemaking below.

Contrary to the urging of the Unions, however, this court may not impose its own rigid interpretation of the "public interest." We are unwilling to say that the USPS may not consider the benefits of a proposed suspension to businesses engaged in commerce abroad, including their enhanced competitiveness in the international arena. Neither are we willing to say that there are no circumstances in which the Service could justify a suspension to allow unrestricted international remailing. The Unions are correct in asserting, however, that where several more narrowly defined suspension alternatives were under consideration, the USPS acted arbitrarily and capriciously in not explaining its reasons for rejecting these alternatives. *See International Ladies' Garment Union v. Donovan,* 722 F.2d 795, 815–18 (D.C.Cir.1983), *cert. denied,* 469 U.S. 820, 105 S.Ct. 93, 83 L.Ed.2d 39 (1984). The Postal Service submitted to the district court a declaration of Charles D. Hawley, its Assistant General Counsel, which provides reasons as to why the alternatives were rejected. Even if these reasons are accurate, this court "may not accept [agency] counsel's *post hoc* rationalizations for agency action.... [A]n agency's action must be upheld ... on the basis articulated by the agency itself." *Motor Vehicle Mfrs.,* 463 U.S. at 50, 103 S.Ct. at 2870.

Finally, because we find that the USPS did not engage in reasoned decisionmaking due to its insufficient attention to the impact of the suspension on all postal patrons, we need not reach the question of whether the evidence of the selective benefits to the business community was sufficient. We note merely that agencies are entitled to engage in predictive judgments of the future public interest and that "complete factual support" is not required where such predictions "necessarily involve[ ] deductions based on the expert knowledge of the agency." *FCC v. National Citizens Comm. for Broadcasting,* 436 U.S. 775, 814, 98 S.Ct. 2096, 3121, 56 L.Ed.2d 697 (1978). Yet, agencies are not free to engage in unreasoned decisionmaking. Specifically, agencies cannot "ignore important factors in making predictions, or ... reach judgments that are irrational given the relevant evidence in the record." *International Ladies Garment Union,* 722 F.2d at 821 n. 56.

### III. CONCLUSION

We find that a faithful application of the recent teachings of the Supreme Court on prudential standing establishes that the Unions clearly fall within the "zone of interests" of the Private Express Statutes. Although the Postal Service may be able to justify a wholesale suspension of the PES with respect to international remailing, we conclude that the record before us does not reflect sufficient consideration of the core purposes of the Statutes. Because the impact of the proposed suspension on *all* of the Postal Service's patrons was never seriously considered and because the USPS failed to explain why narrower alternatives were rejected, the rulemaking was arbitrary and capricious in violation of the APA. 5 U.S.C. § 706(2)(A). We therefore remand to the district court to vacate the grant of summary judgment and to allow the agency an opportunity to reopen its proceedings or take any other action consistent with this ruling.

*It is so ordered.*

RUTH BADER GINSBURG,
concurring:

While I concur in the court's opinion, I write separately to highlight a disturbing facet of this case. The Postal Service, as the historical record confirms, initially sought to maintain tight restraints on international remailing by private carriers. *See* 50 Fed.Reg. 41462 (Oct. 10, 1985). Its effort to confine the practice encountered the concerted opposition of the business community and the Department of Justice. In a *volte-face*, the Service then devised a rule broadly permitting international remailing. I agree with my colleagues that the Service did not draw from the rulemaking record reasons adequate to justify its action. I emphasize, however, that the Service, in accounting for its action, did not home in on comments in the record emphasizing that international remailing is different from domestic mail service, and suggesting that private competition in the international remailing market can be cordoned off safely without opening the way for seriatim inroads on the Postal Service monopoly.[1] On remand, the Service could focus its sights more precisely on the international/domestic mail delivery differential.

In finding that the public interest requirement was met in this case, the Service rested on "almost universally consistent ... observations" that remailing was faster and cost less than U.S. airmail. 51 Fed.Reg. 29636, 29637 (Aug. 20, 1986). These savings in time and cost, the Service found, "enhanc[ed] the ability of American firms to compete abroad." *Id.* In conclusion, the Service acknowledged comments favoring allowance of international remailing operations made by the Department of Commerce, the Department of Justice, and the Office of Management and Budget. *Id.* The Postal Service monopoly would quickly crumble, however, if the public interest required suspension of the Private Express Statutes whenever a private carrier could serve U.S. businesses faster and at a lower price. Commenters accordingly featured something more. Because international mail is distinct and separable from stateside postal operations, they reasoned, the international remailing permission at issue would leave intact the solid core of the monopoly decreed by Congress.

Commenters stressed this key point: the domestic monopoly leaves all mailers in the same boat, but extending that monopoly to the international arena put U.S. businesses at a marked disadvantage relative to their foreign competitors. *See* Joint Appendix (J.A.) at 124, 137, 138, 164. Commenters further observed that outgoing international mail imposes on the Postal Service far fewer capital and operational costs than does domestic mail. The Postal Service simply packages overseas missives and puts them on a ship or plane; a foreign postal service does the delivery work. There are no "small towns" to be served by the Postal Service at great cost. *See* J.A. at 143, 306, 373. The cost-of-service differential suggests that, in comparison to the domestic arena, a monopoly in the international domain is less vital to the Private Express Statutes' goal of assuring universal, affordable service.

Similarly, and of special relevance to the union's concerns, commenters noted that the Postal Service freight forwarding operation for international mail is not labor intensive; therefore, these commenters said, international remailers posed no large threat to postal jobs. J.A. at 149. Furthermore, comments emphasized the limited character of the service at stake: international remailers deal with bulk mailings for large business mailers. J.A. at 210.

In sum, the comments invited close attention to the question whether international mail should be distinguished from domestic mail in implementing legislation, the Private Express Statutes, designed to "bind the Nation together" through universal service at a uniform price. *See* J.A. at 305. That question could be pivotal in the fur-

---

1. The remailing service at issue raises no question under international mail reciprocity agreements, as counsel for appellants conceded at argument. *But see* Reply Brief of Plaintiffs–Appellants at 9. Foreign governments would not have the problem of dealing with multiple originating mail suppliers, for the remailers simply

ther examination this court has ordered.[2]

deposit the letters they carry in the mails of foreign postal administrations.

2. Some commenters, most notably the Department of Justice, questioned whether Congress intended to grant the Postal Service a monopoly over international mail as well as domestic mail. *See* J.A. at 196–202; *see also id.* at 261, 395, 473, 516, 640. In view of the firm position of the Postal Service that the Private Express Statutes apply to international shipments of letters, *see* 51 FED.REG. 21929, 21930 (June 17, 1986), lower courts properly reserve this question for legislative clarification. *See Chevron U.S.A. Inc. v. NRDC,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984).