CHEM SERVICE, INC., Plaintiff,

v.

ENVIRONMENTAL MONITORING SYS-
TEMS LABORATORY—CINCINNATI
OF THE UNITED STATES ENVIRON-
MENTAL PROTECTION AGENCY,
Thomas Clark, and United States Envi-
ronmental Protection Agency, Defen-
dants,

NSI Environmental Solutions, Inc.,
Defendant–Intervenor.

Civ. A. No. 92–0989.

United States District Court,
E.D. Pennsylvania.

Jan. 12, 1993.

F. Michael Friedman, Pagano, Wills & Friedman, Media, PA, for plaintiff.

James G. Sheehan, U.S. Atty's. Office, Karen Elizabeth Rompala, Special Asst., U.S. Atty., Harry A. Short, Jr., Liebert, Short & Hirshland, Philadelphia, PA, James A. Hourihan, Martha R. Moffett, Hogan & Hartson, Washington, DC, for defendants.

### MEMORANDUM

JOYNER, District Judge.

Plaintiff, Chem Service, Inc., filed this action seeking declaratory and injunctive relief from portions of several Cooperative Research and Development Agreements entered into between defendants, the Environmental Monitoring Systems Laboratory—Cincinnati of the United States Environmental Protection Agency, Thomas Clark, in his capacity as director of EMSL–CI, and the Environmental Protection Agency and three private organizations. NSI. Environmental Solutions, Inc., one of the three private organizations, subsequently intervened as a party defendant. For the purposes of this motion, NSI, the intervening defendant, and the EPA and EMSL–CI will collectively be referred to as the defendants. Plaintiff asserts jurisdiction under the Administrative Procedure Act, 5 U.S.C. §§ 702, 703 and 704 and 28 U.S.C. § 1331.

Presently before the court are the Defendants' motions to dismiss the complaint or, in the alternative, in limine to restrict judicial review to the administrative record. For the reasons which follow, we find that plaintiff lacks standing to bring this action and therefore, plaintiff's claim must be dismissed.

### Statement of Facts

In 1986 Congress passed the Federal Technology Transfer Act ("FTTA"). 15 U.S.C. § 3710a et seq. (1991). In short, the purpose of the FTTA is to encourage technology transfer between government scientists and private industry. S.Rep. No. 283, 99th Cong., 2d Sess., (1986) reprinted in 1986 U.S.C.C.A.N. 3442. To effectuate this purpose the FTTA authorizes each federal agency to permit the director of any government-operated federal laboratory to enter into cooperative research and development agreements ("CRADAs") with, among others, private entities. 15 U.S.C. § 3710a(a)(1). A CRADA is defined as:

> any agreement between one or more Federal laboratories and one or more non-Federal parties under which the Government, through its laboratories, provides personnel, services, facilities, equipment or other resources with or without reimbursement (but not funds to non-Federal parties) and the non-federal parties provide funds, personnel, services, facilities, equipment, or other resources toward the conduct of specified research or development efforts which are consistent with the missions of the Laboratory ...

15 U.S.C. § 3710a(d). Essentially, a CRADA is a contract under which a private company contributes money and expertise to a federal laboratory to augment its own research in exchange for rights in any resulting inven-

tions. Thomas N. Bulleit, Jr., *Public–Private Partnerships in Biomedical Research; Resolving Conflicts of Interest Arising Under the Federal Technology Transfer Act of 1986,* 4 J.L. & Health 1 (1989/1990).

In 1991, the Environmental Monitoring Systems Laboratory—Cincinnati ("EMSL–CI") of the Office of Research and Development of the Environmental Protection Agency ("EPA") entered into five CRADAs with industrial organizations pursuant to the FTTA. These CRADAs were designed to continue the efforts of EMSL–CI in distributing reference materials[1] to government and private organizations for calibration of analytical instruments. In its amended complaint, plaintiff objects to the CRADAs awarded to NSI Environmental Solutions, Inc. ("NSI"), Ultra Scientific and SPEX Industries.

Prior to 1991, EPA ran several programs for the production and distribution of reference materials. Two of these programs were the Repository for Toxic and Hazardous Materials ("RTHM") and the Pesticides Repository. The RTHM materials were solutions of a single organic compound in a solvent. The Pesticides Repository materials were "neat" materials, that is, an undissolved sample of the material. The materials for both the RTHM and Pesticide Repository were produced under a competitive contract between NSI and EPA from approximately 1984 through 1990.

In its amended complaint plaintiff challenges the CRADAs in a number of ways. First, plaintiff contends that the terms of the CRADA with NSI permit the transfer to and distribution by NSI of RTHM inventory prepared under the competitive contract as well as new samples of the same material as were produced under the competitive contract using the same technology as was previously used. Plaintiff contends that this arrangement is essentially a scheme to market government property and since it does not involve research or development it violates the essential purpose of the FTTA as well as the Advertising Act, 41 U.S.C. § 5, the Government Contracts Act, 41 U.S.C. § 35 *et seq.,* the Competition in Contracting Act, 41 U.S.C. § 251 *et seq.,* the Federal Acquisition Regulations, 48 C.F.R. § 1 and the Federal Property Management Regulations, 41 C.F.R. § 101–45.300 *et seq.* Further, plaintiff alleges that, in violation of the FTTA which forbids Government funding under a CRADA, 15 U.S.C. § 3710a(d), the defendants have continued to pay NSI under the terms of the competitive contract for stability studies and other maintenance of the RTHM inventory. Plaintiff also alleges that permitting NSI to sell the RTHM inventory which was prepared under the competitive contract was an indirect means of providing government funding, again, in violation of the FTTA. Plaintiff's allegations against the SPEX and Ulta CRADAs are similar, although not identical, to those against NSI. For the purposes of this motion we need not detail the distinctions between the claims against each of the defendants.

For a period of time prior to the granting of the CRADAs, the American Association for Laboratory Accreditation ("A2LA"), a private organization, had been developing specifications for reference standards with the EPA Office of Solid Waste Management and EMSL–CI. Plaintiff received accreditation by A2LA and was thereafter permitted to label its products as "A2LA Certified." Plaintiff contends that in order to obtain and maintain its accreditation by A2LA it was and is required to submit to rigorous testing by independent laboratories, inspections by A2LA and obtain reference testing of all lots of materials produced as "A2LA Certified."

On June 18, 1991 EMSL–CI entered into a Memorandum of Understanding ("MOU") with A2LA in which EMSL–CI and A2LA agreed that the certification programs run by each party to the MOU would contain equivalent technical specifications. These specifications were later finalized in documents known as the Specifications for Synthetic Reference Materials ("RM–02 Specs") and the Specifications for Neat Reference Materials ("RM–01 Specs"). Plaintiff alleges that

---

1. Plaintiff provides the definition of a reference material as being a material or substance, one or more properties of which are sufficiently well established to be used for the calibration of an apparatus, the assessment of a measurement method or for assigning values to materials.

the MOU commits the EPA to allowing the use of the words "EPA Certified" to be applied to reference materials which meet the same technical specifications as "A2LA Certified" standards. Yet, plaintiff contends, EPA allows NSI, Ultra and SPEX to label RTHM and Pesticides materials as "EPA Certified" even though they were not produced according to the RM–01 or RM–02 Specs.

## DISCUSSION

### Standard

A court may grant a motion to dismiss in accordance with Fed.R.Civ.P. 12(b)(6) if it appears beyond a doubt that the plaintiff can prove no set of facts to support the relief requested. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957); *Pennsylvania ex rel. Zimmerman v. Pepsico, Inc.*, 836 F.2d 173, 179 (3d Cir.1988). In deciding a motion to dismiss, the court must accept as true all well plead factual allegations of the non-moving party, and must view all inferences in the light most favorable to that party. *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 249–50, 109 S.Ct. 2893, 2905–06, 106 L.Ed.2d 195 (1989); *Rocks v. Philadelphia*, 868 F.2d 644, 645 (3d Cir.1989).

In support of their motion to dismiss, defendants advance essentially three arguments. First, defendants contend that plaintiff does not have standing to challenge any action taken by the EPA or EMSL–CI because it is not within the "zone of interest" to be protected or regulated by the statute in question. Second, defendants contend that because plaintiff is not a party to the Memorandum of Understanding between EMSL–CI and A2LA, it does not have standing to contend that it has been violated. Lastly, defendants argue that plaintiff is not entitled to judicial review because the matter has been committed to agency discretion. In the alternative, defendants argue that this court's review should be restricted to the administrative record.

### Standing

The statutory basis for plaintiff's standing to challenge the CRADAs is the Administrative Procedure Act ("APA") which provides:

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.

5 U.S.C. § 702.

In order to have standing to challenge agency action the plaintiff must show not only the elements necessary under Article III § 2 of the Constitution,[2] but he must also satisfy the requirements of what is known as prudential standing which denies standing as a matter of judicial prudence rather than Constitutional restraint. 13 Wright, Miller & Cooper, *Federal Practice and Procedure* § 3531.7. Under the APA, in order to have prudential standing the plaintiff must show that his interests are arguably within the zone of interests intended to be protected by the statute or constitutional provision on which the claim is based. *Specter v. Garrett*, 971 F.2d 936, 942 (3d Cir.1992) *citing Association of Data Processing Service Orgs. Inc. v. Camp*, 397 U.S. 150, 152–53, 90 S.Ct. 827, 829–30, 25 L.Ed.2d 184 (1970). Although there is a presumption provided by § 702 that Congress intended agency action to be subject to judicial review, *Clarke v. Securities Industry Ass'n*, 479 U.S. 388, 395 & 399, 107 S.Ct. 750, 755 & 757, 93 L.Ed.2d 757 (1987), that presumption may be overcome by express statutory language, the statute's legislative history, its objectives or the legislative scheme as a whole. *Block v. Community Nutrition Institute*, 467 U.S. 340, 349–51, 104 S.Ct. 2450, 2456–57, 81 L.Ed.2d 270 (1984); *Specter v. Garrett*, 971 F.2d 936, 956 (3d Cir.1992) (Alito, J. concurring in part and dissenting in part). Fur-

---

**2.** The parties do not contest plaintiff's "case or controversy" standing under Article III § 2 of the Constitution which requires (1) that the plaintiff has suffered some actual or threatened injury as a result of the putatively illegal conduct; (2) that the injury is fairly traceable to the challenged conduct; and (3) the injury is likely to be redressed by a favorable decision. *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 471, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982).

**332**

thermore, when considering the issue of standing under § 702 of the APA, the statute which must be examined is "the statute whose violation is the gravamen of the complaint." *Lujan v. National Wildlife Federation,* 497 U.S. 871, 885, 110 S.Ct. 3177, 3187, 111 L.Ed.2d 695 (1990); *see also Air Courier Conference v. American Postal Workers Union,* 498 U.S. 517, 527–29, 111 S.Ct. 913, 920, 112 L.Ed.2d 1125 (1991); *District 2, Marine Engineers Beneficial Association v. Burnley,* 936 F.2d 284, 286 (6th Cir.1991). Indeed, as a result of this additional standing requirement, not all those who are injured by wrongful agency action are permitted to sue to redress that injury. *North Shore Gas, Co. v. E.P.A.,* 930 F.2d 1239, 1242 (7th Cir.1991).

In the case at hand, plaintiff claims that its injuries stem primarily from its position as a competitor of NSI, Ultra and SPEX for the production, distribution and sale of reference, neat and inorganic materials. Relying upon the language in *Clarke,* which suggests that the zone of interest test permits that standing be determined by examination of *any* statute upon which plaintiff relies for relief, plaintiff urges this court to look toward the federal procurement laws to determine plaintiff's standing. 479 U.S. at 399, 107 S.Ct. at 758. However, as explained in the subsequent Supreme Court decision *Air Courier Conference, Clarke* merely permits the courts to look beyond the statute which is the focus of the complaint in order to better understand the overall purpose of that statute. *Air Courier Conference,* 498 U.S. at 527–29, 111 S.Ct. at 920. In short, plaintiff's complaint alleges that the CRADAs at issue in this case are violative of the FTTA and therefore the agency action should have been subject to the competitive bidding process as outlined in the federal procurement laws. Plaintiff's complaint rests upon the FTTA and the means by which the EPA awarded these CRADAs thereunder. Thus, our analysis must turn to whether a competitor such as plaintiff is arguably within the zone of interest intended to be protected by the Federal Technology Transfer Act.

■ After a careful review of the language of the FTTA, its purpose and its legislative history, we conclude that although plaintiff may have been injured in fact it is not a party that was meant to fall within the Act's ambit of protection and, therefore, plaintiff lacks standing to bring this action.

Although plaintiff challenges the CRADAs which by definition are primarily concerned with research and development, the CRADAs are merely a means of implementing the FTTA. Thus, our review begins with the origins of the Act. The impetus for this Act was Congressional concern that although the Federal laboratories possess vast resources and superior scientific expertise and develop a large number of inventions, only five percent of the Federally owned patents were ever utilized. *New Technologies on Economic Competitiveness: Hearings before the Subcomm. on Science, Technology and Space,* 99th Cong., 1st Sess. 3 (1985) (statement of Senator Hollings); S.Rep. No. 283, *supra.* (Report of Sen. Danforth) (in 1986 the federal laboratories employed one-sixth of the nation's scientists and engineers and produced over 28,000 patents yet only approximately five per cent of those patents were ever utilized).

■ The FTTA was passed to further the intent of the Stevenson–Wydler Technology Innovation Act of 1980 (Pub.L. 96–480) which made the "transfer of Federal Technology to industry, States, and localities a national policy and duty of each laboratory." S.Rep. No. 283 *supra.* at 3, U.S.Code Cong. & Admin.News 1986, p. 3446; *see also* S.Rep. No. 283 *supra.* at 5, U.S.Code Cong. & Admin.News 1986, p. 3447 (FTTA intended to "improve the technology transfer provisions of the Stevenson–Wydler Act . . . by bringing them into conformity with actual practice."). Despite the passage of the Stevenson–Wydler Act, Federal laboratories still refrained from entering into cooperative agreements with industry because of organizational and legal restraints. *The Stevenson–Wydler Innovation Act; Report to the President and Congress from the Secretary of Commerce;* February 1984, p. 24 *quoted in* S.Rep. No. 283 *supra.* at 4; Vol. 131 Cong.Rec. 35823 (daily ed. Dec. 10, 1985) (statement of Cong. Marilyn Lloyd). Senator Danforth, as Chairman of the Committee on Commerce, Science and Transportation, stated that

The Bill would amend the Stevenson–Wydler Technology Innovation Act of 1980 and would establish a number of procedures to encourage the development of technologies by laboratories owned or operated by the federal government, to facilitate the transfer of such technologies to the public, and to promote cooperation between those laboratories.

S.Rep. No. 283 *supra.* at 6, U.S.Code Cong. & Admin.News 1986, p. 3447. Thus, the FTTA was passed in order to ensure the transfer of technology developed by federal agencies to the private sector[3]. S.Rep. No. 283, *supra.* at 1. ("The purpose of this bill is to improve the transfer of commercially useful technologies from the Federal laboratories and into the private sector."); *Id. citing* Report of the White House Council Federal Laboratory Review Panel, at 11 (1983) ("R & D interactions between Federal laboratories and industry should be greatly increased by more exchange of knowledge and personnel, collaborative projects, and industry funding of laboratory work.").

The CRADAs are the means of implementing the Act. As to the CRADAs themselves, there are very few guidelines for an agency to follow when establishing such an agreement with a private company. The Act states that when entering into a CRADA, the agency "shall be guided by the purposes of this chapter." 15 U.S.C. § 3710a(c)(2). Furthermore, the only limitation on which business should be chosen to form a CRADA with the agency is that the agency should give preference to small business firms and domestic businesses. 15 U.S.C. § 3710a(c)(4). Otherwise, the agency has unrestrained discretion in establishing CRADAs. S.Rep. No. 283 *supra.* at 10 ("the director retains discretion to decide into which cooperative agreements, if any, to enter.")[4]

After analyzing the purpose of the Act and the primary means by which that purpose is to be effectuated, we must now turn to the Act and its legislative history to delineate the party or group Congress intended to protect and/or benefit by passage of the Act. The legislative history is replete with evidence that the intended beneficiary of the FTTA is the health and economic well-being of the nation as a whole and not the interests of individual businesses. The following are a few examples:

> The ultimate purpose of Federal support for R & D is to develop the science and technology base needed for a strong national defense, for the health and well-

---

**3.** The stated purpose of the Act is as follows:

> **§ 3702. Purpose**
> It is the purpose of this chapter to improve the economic, environmental, and social well-being of the United States by—
> (1) establishing organizations in the executive branch to study and stimulate technology;
> (2) promoting technology development through the establishment of cooperative research centers;
> (3) stimulating improved utilization of federally funded technology developments, including inventions, software, and training technologies, by State and local governments and the private sector;
> (4) providing encouragement for the development of technology through the recognition of individuals and companies which have made outstanding contributions in technology; and
> (5) encouraging the exchange of scientific and technical personnel among academia, industry, and Federal laboratories.

15 U.S.C. § 3702 (1980 & Supp.1992).

**4.** As one authority stated:

> The process by which a federal laboratory and a nonfederal partner are brought together into a productive joint research project is much more flexible and subtle than the government's normal purchase of goods and services through the regulated procurement process. Although the parties to a procurement contract have reached a meeting of the minds, they may (and often do) lack common interests and goals. In contrast, a cooperative research and development agreement depends for its success upon the shared interests of the parties and their ability to work together with a high degree of trust so that their common goals can be achieved. Negotiations between prospective research partners are intended just as much to determine a common view toward the conduct of the project as they are to finalize the legal responsibilities of each party.

Robert H. Swennes II, *Commercializing Government Inventions: Utilizing the Federal Technology Transfer Act of 1986,* 20 Pub.Cont.L.J. 365 (Spring 1991). *See also* S.Rep. No. 383, *supra.* at 10, U.S.Code Cong. & Admin.News 1986, p. 3451 (The FTTA "authorizes a broad range of cooperative research and development arrangements where there is a mutual interest between the laboratory mission and other levels of government or private sector organizations.")

being of U.S. citizens, and for a healthy U.S. economy.

S.Rep. No. 283 *supra.* at 2, U.S.Code Cong. & Admin.News 1986, p. 3443.

A director may, for example, give priority to proposed cooperative agreements which, in the judgment of the director, are most likely to benefit employment in the United States or the technical development of U.S. companies.

*Id.* at 11, U.S.Code Cong. & Admin.News 1986, p. 3452.

It is expected that these authorities will open an entirely new form of benefit to State and local governments by allowing the Federal laboratories to become active partners and contributors of technologies to promote regional economic development.

*Id.*

[The provisions of the FTTA] are geared toward encouraging economically productive research and development projects to enable industry to take advantage of the latest scientific developments in their fields, and thereby increase productivity, employment, and international competitiveness.

Vol. 131 Cong.Rec. 36354 (daily ed. Dec. 12, 1985) (statement of Cong. Paul B. Henry).

We in the Congress had recognized the need to take advantage of the unique contributions universities and Federal laboratories could make to the effort to stimulate our economy if encouraged to cooperate with private industry.

Vol. 131 Cong.Rec. 35239 (daily ed. Dec. 9, 1985) (statement of Cong. Fuqua).

In support of the FTTA, Congressman Michel most pointedly stated:

I guess one of my pet peeves over the years is that we tend to fund so much in the way of research at the Federal level which seemingly just ends up on some shelf gathering dust ...

This is particularly damaging when it comes to our competitive position in the world market. We all know how our position as world leader in the areas of technology, innovation, engineering, and manufacturing has been eroding. While there are many reasons for this, certainly one of the significant ones is the failure of our industry to consistently translate new technology into competitive products ... This bill will help us become more competitive in the world market, increase the use of federally funded research, and assist in the creation of additional jobs in this country.

*Id.* (statement of Cong. Michel).

■ When enacting the FTTA the specific Congressional intent was to encourage the transfer of federally developed technology to the private sector and thereby stimulate the economy by protecting this country's position in the world marketplace and creating jobs within the country. *See New Technologies on Economic Competitiveness: Hearings before the Subcomm. on Commerce, Science, and Transportation,* 99th Cong. 1st Sess. 2 (1985) (statement of Sen. Riegle) ("We cannot continue to create jobs, compete in the world economy and retain our standard of living without a technological advantage"). Nowhere in the legislative history or the Act is there any indicia of a Congressional concern for the interests of individual businesses *qua* competitors. Rather, the Act is concerned with improving the nation as a whole so that it may compete globally, not with ensuring the competitive rights of individual domestic companies. To continue Congressman Michel's analogy, the purpose of the Act is to take useful technology off the federal shelves and inject it into our nation's economy where it can benefit the nation as a whole and thus enable the United States to keep abreast of technological advancements on a global level. Unfortunately for individual competitors such as the plaintiff in this case, the method by which this is being done is not as egalitarian as that provided by the federal procurement and contract laws.

Accordingly, our analysis leads us to conclude that plaintiff and its interests are not arguably within the zone of interest of the Federal Technology Transfer Act and therefore, lacks standing to challenge the CRADAs.

■ Lastly, plaintiff seeks to enforce the terms of the MOU between EMSL–CI and A2LA. Plaintiff urges this court to construe the MOU as an interpretive rule, a general

statement of policy or a rule of agency organization, procedure or practice so as to be exempt from the usual public comment requirements yet make it enforceable both by and against the agency. 5 U.S.C. § 553. Even if the MOU is a "rule" under the APA and may therefore be enforceable, again, plaintiff is essentially attempting to challenge agency action and we would be required to proceed through the "zone of interest" inquiry once again. Whether the MOU is a rule or not does not alter the outcome of our decision for if the MOU is not a rule it is not enforceable and if it is a rule, plaintiff does not have standing to seek its enforcement.

In entering into the MOU, the EPA and EMSL–CI were continuing the implementation of the FTTA and, thus, our analysis is the same as it was in determining plaintiff's standing to challenge the CRADAs above. Plaintiff contends that our analysis under the MOU is different because plaintiff is "the subject of the contested regulatory action." *Clarke*, 479 U.S. at 399, 107 S.Ct. at 757. However, plaintiff's amended complaint states that its A2LA certification is based upon its agreement with A2LA not according to the terms of the MOU. ¶¶ 44, 45. Therefore, plaintiff is not the subject of the MOU. As with plaintiff's challenge to the CRADAs, perhaps plaintiff is suffering actual injury as a result of defendants' failure to comply with the terms of the MOU. However, the MOU, if it is an agency rule, is simply another means of implementing the FTTA and, therefore, plaintiff does not have standing to seek enforcement of the terms of the MOU.

As a result of our conclusion that plaintiff does not have standing to challenge the actions taken by the EPA and EMSL–CI at issue in this case, we need not address defendants' alternative motion in limine to restrict our review to the administrative record.

An appropriate order follows.

### ORDER

AND NOW, this 11th day of January, 1993, upon consideration of the Motion of Defendants, the Environmental Monitoring Systems Laboratory—Cincinnati of the United States Environmental Protection Agency, Thomas Clark, in his capacity as director of Environmental Monitoring Systems Laboratory—Cincinnati, and the Environmental Protection Agency, as well as NSI Environmental Solutions, Inc., the Intervening Defendant, to Dismiss the Amended Complaint or, in the Alternative, to Restrict Judicial Review to the Administrative Record and the Plaintiff's responses thereto, it is hereby ORDERED that the Motion to Dismiss the Amended Complaint is GRANTED.