**DUTY FREE INTERNATIONAL, INC., Ammex Warehouse Company, Inc., and Ammex Tax & Duty Free Shops, Inc., Plaintiffs–Appellants,**

v.

**The UNITED STATES, Defendant– Appellee,**

**and**

**Git–N–Go, Defendant–Appellee.**

**No. 95–1443.**

United States Court of Appeals, Federal Circuit.

July 9, 1996.

Laurence M. Friedman and Brian S. Goldstein, Tompkins & Davidson, New York City, argued for plaintiffs-appellants. With them on the brief was Harvey A. Isaacs.

Susan Burnett Mansfield, Civil Division, Department of Justice, International Trade Field Office, New York City, argued for defendant-appellee United States. With her on the brief were Frank W. Hunger, Assistant Attorney General, and David M. Cohen, Director, Washington, D.C., and Joseph I. Liebman, Attorney in Charge, International Trade Field Office. Of counsel was Christopher Doherty, Assistant Chief Counsel, U.S. Customs Service, Boston, Massachusetts.

Martin J. Ward, Leahy & Ward, Boston, Massachusetts, argued for defendant-appellee Git–N–Go.

Before PLAGER, LOURIE, and BRYSON, Circuit Judges.

BRYSON, Circuit Judge.

The appellants, which we refer to collectively as "Duty Free," operate a duty-free store in upstate New York near the Canadian border. They are prosecuting this action in an effort to prevent a competing duty-free store from operating in the same area. The Customs Service decided that the second duty-free store, run by appellee Git–N–Go (GNG), was operating consistently with the governing statutes and regulations, and the Court of International Trade agreed. We affirm.

### I

Both Duty Free and GNG operate duty-free stores on the East Service Road of Interstate 87 in Champlain, New York. The stores are located opposite the last on-off ramp south of the Canadian border. Customers who make purchases at the duty-free stores are expected to drive onto the Interstate and proceed into Canada, approximately one mile north of the on-off ramp.

The Customs Service approved Duty Free's operation of its duty-free store on August 17, 1988, and Duty Free began operating the store in June 1990. Later that year, GNG applied for permission to operate its duty-free store in the same area. In May 1991, Customs approved GNG's application. Duty Free subsequently brought an action in the Court of International Trade seeking to force Customs to revoke the permission granted to GNG to operate its duty-free store. Duty Free argued that the authorization granted to GNG was contrary to the applicable statute in several respects. Although Duty Free's operation is generally similar to GNG's, Duty Free has maintained throughout this litigation that it is not subject to the same restrictions as GNG, because its operation was approved prior to the August 23, 1988, effective date of the duty-free store statute and GNG's operation was not. *See* 19 U.S.C. § 1555(b)(3)(F)(ii)(II). Duty Free thus claims that it enjoys "grandfather" status under the statute, while GNG does not.

The Court of International Trade first denied Customs' motion to dismiss Duty Free's action for lack of standing. *Duty Free Int'l, Inc. v. United States,* 16 Ct. Int'l Trade 163, 1992 WL 63001 (1992). The court then remanded the case to the Customs Service to compile the full administrative record and provide the court with a more complete explanation for its decision to approve GNG's operation. *Duty Free Int'l, Inc. v. United States,* 17 Ct. Int'l Trade 1425, 1993 WL 541682 (1993). On remand, Customs explained that GNG's duty-free operation had been approved after GNG agreed to have a

bonded cartman deliver the duty-free merchandise to customers near the northbound on-ramp to the Interstate highway. That procedure, Customs explained, provided substantial assurance that the merchandise would be exported to Canada and therefore satisfied the statutory and regulatory requirements for a duty-free store. Following the remand proceedings, the Court of International Trade upheld Customs' action and granted the government's motion for judgment on the agency record. *Duty Free Int'l, Inc. v. United States,* No. 91–07–00534, 1995 WL 283836 (Ct. Int'l Trade May 12, 1995).

## II

Before this court, Duty Free raises the same arguments it raised before the Court of International Trade. For essentially the same reasons given by that court in its thorough opinion, we reject Duty Free's challenge to Customs' decision not to revoke GNG's permission to operate its Champlain duty-free store.

At the outset, we note that it is open to question whether Duty Free is entitled to challenge Customs' action in granting GNG's application to operate a duty-free store. The issue is not one of constitutional standing, since Duty Free, as a direct competitor, can claim a financial injury from the approval of GNG's operation, an injury that would be resolved by the revocation of that approval. Duty Free's complaint therefore satisfies the "case or controversy" requirement of Article III. *See United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.,* — U.S. —, — – —, 116 S.Ct. 1529, 1533–34, 134 L.Ed.2d 758 (1996); *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324–25, 82 L.Ed.2d 556 (1984). The issue, instead, is whether Duty Free has standing to sue under the Administrative Procedure Act, *i.e.,* whether Duty Free has suffered a legal wrong because of the challenged agency action, or is adversely affected or "aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. *See Air Courier Conference v. American Postal Workers Union,* 498 U.S. 517, 523–24, 111 S.Ct. 913, 917, 112 L.Ed.2d 1125 (1991); *Clarke v. Securities Indus. Ass'n,* 479 U.S.

388, 394, 107 S.Ct. 750, 754, 93 L.Ed.2d 757 (1987). The answer to that question turns on whether the injury Duty Free complains of falls within the " 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for [Duty Free's] complaint." *Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 883, 110 S.Ct. 3177, 3186, 111 L.Ed.2d 695 (1990).

Because the "APA standing" issue is not jurisdictional, it can be waived by the parties. *See Air Courier Conference,* 498 U.S. at 523 n. 3, 111 S.Ct. at 917 n. 3. The government has not raised the issue on appeal, even though it litigated the question before the Court of International Trade. In light of the government's express waiver of the issue, we decline to reach the standing question and thus proceed to the merits.

## III

The statute governing the establishment of duty-free stores, 19 U.S.C. § 1555, provides that each duty-free sales enterprise "shall establish procedures to provide reasonable assurance that duty-free merchandise sold by the enterprise will be exported from the customs territory." 19 U.S.C. § 1555(b)(3)(A). In the case of a duty-free store that is a "border store" approved for operation after August 23, 1988, duty-free merchandise must be delivered "at a merchandise storage location at or beyond the exit point." 19 U.S.C. § 1555(b)(3)(F)(ii)(I).

Duty Free makes essentially two arguments, both based on that provision of the duty-free store statute. GNG's application to operate a duty-free store should have been denied, Duty Free argues, (1) because its merchandise is not delivered "at or beyond the exit point"; and (2) because the merchandise is not delivered "at a merchandise storage location."

## A

With respect to the first issue, the statute defines the term "exit point" broadly. "Exit point" means "the area in close proximity to an actual exit for departing from the customs territory." 19 U.S.C. § 1555(b)(8)(F). The pertinent Customs regulation further defines

the term "exit point" as it applies to border stores: "The exit point in the case of a land border or seaport duty-free store is the point at which a departing individual has no practical alternative to continuing on to a foreign country or to returning to Customs territory by passing through a U.S. Customs inspection facility." 19 C.F.R. § 19.35(d).

In the remand proceedings, Customs explained that it construes its regulation requiring that there be "no practical alternative" to exportation for a duty-free store customer to be consistent with the statutory requirement that there be a "reasonable assurance" that goods sold in a duty-free store will be exported, 19 U.S.C. § 1555(b)(3)(A). Reading the two provisions together, Customs concluded that GNG's application was properly granted because GNG's delivery procedures ensure that there is no more than a "low probability" that duty-free merchandise will not be exported. The Court of International Trade held that Customs' interpretation of the statutory and regulatory language was permissible, and so do we.

The statutory phrase "close proximity to an actual exit," which defines the term "exit point," is not language of precision, but instead suggests a congressional intention to accord substantial discretion to Customs to determine what areas within the United States are "at or beyond the exit point." We agree with the government that, under appropriate circumstances, Customs may conclude that a point less than a mile from an actual exit from the country is within "close proximity" to an actual exit. Such a location can therefore be considered "at or beyond the exit point," within the meaning of the statute.

With respect to the language of the regulatory definition of "exit point," 19 C.F.R. § 19.35(d), it is true, as Duty Free argues, that the language "no practical alternative" in the regulation seems facially more restrictive than the phrase "low probability that the duty free merchandise ... would not be exported," which was the language Customs used to describe the standard it applied in reviewing GNG's application. Customs, however, made clear that by using the term "low probability" in the setting of this case it

meant that the alternatives to exportation were not "practical within the meaning of 19 C.F.R. § 19.35(d)." That regulation further provides that the district director's decision "as to what constitutes the exit point or reasonable assurance of exportation in a given situation is final," 19 C.F.R. § 19.35(d), and in this case the district director determined, after considering all the surrounding circumstances, that GNG's delivery point was beyond the exit point, as that term is defined in the regulation. We conclude that the district director did not abuse the broad discretion granted to him under the statute and the regulations in determining that GNG's delivery point was "beyond the exit point," within the meaning of 19 C.F.R. § 19.39(a).

The administrative record supports Customs' determination that GNG's procedures give a high degree of assurance that GNG's customers will export the goods purchased at GNG's duty-free store. Customs addressed in detail the method GNG uses to ensure that customers proceed onto the Interstate highway, and thus into Canada, after obtaining their goods from a GNG representative. In light of what Customs characterized as "the specific facts of this case," including "the location and nature of the delivery site and the method of monitoring employed by GNG," we cannot agree with Duty Free that Customs' analysis of GNG's delivery procedures must be rejected as inconsistent with the statutory and regulatory framework.

Under GNG's approved procedures, customers make their purchases in GNG's store, but they do not take delivery of the merchandise there. Instead, a bonded cartman transports the purchased merchandise from the GNG warehouse to a spot on the service road approximately two-tenths of a mile south of the on-ramp to northbound Interstate 87 and nine-tenths of a mile south of the Customs building at the Canadian border. The cartman delivers the merchandise to each purchaser at that point and instructs each purchaser that he or she is required to proceed up the ramp onto the Interstate highway. The cartman then watches each car to ensure that it follows the entry ramp onto the highway. Once on the highway going north, the customers may not turn

back into the United States but must continue past the Customs building and into Canada. If a car fails to turn onto the highway and instead uses the service road to turn around and head south, the GNG representative can easily see what the customer is doing and can report the diversion. In addition, the Customs Service noted, the delivery point is within view of the Customs office at the Port of Champlain. As the Customs Service explained, Customs personnel can easily monitor GNG's delivery process, and because GNG employees "cannot know whether a Customs officer is observing the delivery," GNG has an economic incentive to report any diversion of merchandise "so that it can stay in business." Finally, Customs noted that GNG's delivery procedure is similar to that used by Duty Free, and the available evidence indicated that the rate of noncompliance among Duty Free customers is extremely low—approximately one one-hundredth of one percent of the sales made by Duty Free. Under these circumstances, we agree with the Court of International Trade that the Customs Service could properly conclude that GNG's procedures satisfied the requirement that the delivery be made "beyond the exit point," i.e., at a point in close proximity to the actual exit where the purchasers had no practical alternative to proceeding into Canada with their goods. We therefore agree with the Court of International Trade that Customs' decision on remand was consistent with the statutory provisions governing the location of the delivery point, 19 U.S.C. § 1555(b)(3)(F)(ii)(I), and the need for "reasonable assurance that the duty-free merchandise will be exported," 19 U.S.C. § 1555(b)(3)(A).

### B

Duty Free's second argument is that GNG's delivery procedure violates the statute because GNG's merchandise is not delivered "at a merchandise storage location." According to Duty Free, the road-side delivery spot approved by Customs cannot qualify as a "merchandise storage location," because it is merely a point to which a GNG employee transports purchased goods in order to load them into the customers' cars.

■ The duty-free store statute does not define the term "merchandise storage location," and there is no statutory or regulatory requirement that a "merchandise storage location" be a permanent structure as long as the location is "at or beyond the exit point." As we have noted, Customs legitimately concluded that GNG's delivery point satisfies the "at or beyond the exit point" requirement, because it is in close proximity to the actual exit and because customers who take delivery there have no practical alternative to exiting the country. In the remand proceedings, the Customs Service stated the agency's view that "a district director may authorize delivery of merchandise to a mobile merchandise storage location where the traffic configuration and the physical arrangements made by the proprietor and/or the appropriate public authority reasonably assure that merchandise cannot be brought back into the United States." Those standards were satisfied here, Customs concluded, and we are not prepared to second-guess that conclusion on the agency's part.

To be sure, the vehicle in which the GNG cartman shuttles goods from the GNG warehouse for delivery to its customers does not fit the ordinary concept of a "storage location," since the goods are not stored in the vehicle (or at the roadside spot where deliveries are made) for a significant period of time. Nonetheless, neither the statute nor the regulations require that the merchandise be stored at the "merchandise storage location" for any particular period of time, and Duty Free has failed to point to any statutory policy that is frustrated by Customs' construction of the term "merchandise storage location" to include the cartman's vehicle that is used in GNG's delivery system. Deferring as we must to Customs' reasonable construction of the undefined language in the statute it has been charged with enforcing, see *National Customs Brokers & Forwarders Ass'n v. United States*, 59 F.3d 1219, 1222 (Fed.Cir. 1995); *Koyo Seiko Co. v. United States*, 36 F.3d 1565, 1570 (Fed.Cir.1994); *Generra Sportswear Co. v. United States*, 905 F.2d 377, 379 (Fed.Cir.1990), we are unable to say that Customs' application of the statutory requirement is unfaithful to either the lan-

guage of the statute or the purpose underlying it. We therefore decline Duty Free's invitation to strike down Customs' decision in GNG's case as contrary to either the statute or the Customs Service regulations.

*AFFIRMED.*