12 F.3d 1256
 62 USLW 2429, 39 Cont.Cas.Fed. (CCH) P 76,617
 CHEM SERVICE, INC., Appellant,
v.
ENVIRONMENTAL MONITORING SYSTEMS LABORATORY-CINCINNATI OF
the UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; Thomas
A. Clark, in His Capacity as Director of the Environmental
Monitoring Systems Laboratory-Cincinnati of the United
States Environmental Protection Agency; United States
Environmental Protection Agency; NSI Environmental Solutions, Inc.
 No. 93-1196.
 United States Court of Appeals,
Third Circuit.
 Argued Sept. 23, 1993.
Decided Dec. 27, 1993.
 
 F. Michael Friedman (argued), Pagano, Wills & Friedman, Media, PA, for appellant.
 Stuart E. Schiffer, Acting Asst. Atty. Gen., Robert S. Greenspan, Henry D. Gabriel (argued), U.S. Dept. of Justice, Civ. Div., Appellate Staff, Washington, DC, Michael J. Rotko, U.S. Atty., Joan K. Garner, Deputy Chief, Civ. Div., Karen E. Rompala, Sp. Asst. U.S. Atty., Philadelphia, PA, for appellees Environmental Monitoring Systems Laboratory of the U.S.E.P.A., and Thomas Clark.
 James A. Hourihan, Martha R. Moffett, Hogan & Hartson, Washington, DC, Harry A. Short, Jr., Liebert, Short & Hirshland, Philadelphia, PA, for appellee NSI Environmental Solutions, Inc.
 Before: STAPLETON, ROTH and LEWIS, Circuit Judges.
 OPINION OF THE COURT
 ROTH, Circuit Judge:
 
 
 1
 This case arises from a dispute over three cooperative research and development agreements ("CRADAs") entered into by the Environmental Monitoring Systems Laboratory-Cincinnati ("EMSL-CI") of the Environmental Protection Agency ("EPA"). Chem Service, Inc., a non-party to the CRADAs, brought suit against EMSL-CI, the laboratory's director, and EPA, seeking to enjoin the government from performing certain functions agreed to under the CRADAs. The district court held that Chem Service lacked standing under the Administrative Procedure Act ("APA") to bring this suit, because it did not fall within the zone of interests Congress intended to protect when establishing the authority for government laboratories to enter these types of cooperative arrangements, 816 F.Supp. 328. We disagree and find that, as to its first claim, Chem Service does fall within the zone of interests. We will therefore remand to the district court to determine whether the sections of the CRADAs in dispute are actually procurement contracts, pursuant to 31 U.S.C. Sec. 6303, which would require the government to comply with the federal procurement laws.
 
 I.
 
 2
 In 1986, Congress passed the Federal Technology Transfer Act ("FTTA"), Pub.L. No. 99-502, 100 Stat. 1785, codified at 15 U.S.C. Sec. 3710a et seq. (1988). Among the primary purposes of the FTTA was that of increasing the nation's economic competitiveness by encouraging technology transfer from federal government-operated laboratories to private industry. To effectuate this purpose the FTTA authorized federal agencies to permit the director of any government-operated laboratory to enter into CRADAs with private entities. 15 U.S.C. Sec. 3710a(a)(1). In defining the term CRADA,[1] Congress intended to establish a new type of contractual relationship between a federal laboratory and a non-federal party for research and development purposes. Congress specifically intended that a CRADA was not to be a procurement contract, a grant agreement, or a cooperative agreement within the definition of 31 U.S.C. Secs. 6303 and 6305 (1988).[2]
 
 
 3
 On January 4, 1991, EMSL-CI entered into a CRADA with NSI Technology Services Corporation ("NSI") pursuant to the FTTA.[3] EMSL-CI entered into similar CRADAs with Ultra Scientific, Inc., ("Ultra") on January 21, 1991, and with Spex Industries, Inc., ("Spex") on May 9, 1991. The language of these CRADAs provides that they were designed to continue the efforts of EMSL-CI in refining and distributing reference materials for calibration of analytical instruments.[4] Plaintiff Chem Service is in the business of selling organic chemical analytical and reference standards, although it did not enter into a CRADA with EMSL-CI. Chem Service contends that contrary to the expressed purpose of CRADAs as established by Congress, included within these CRADAs is the authorization for NSI, Spex and Ultra to sell reference materials manufactured according to pre-existing technologies. Chem Service urges that the commercial exploitation of such pre-existing technologies violates the provisions of the FTTA, which was established to encourage cooperative research and development efforts.
 
 
 4
 Prior to entering into the CRADAs, EPA ran several programs for the production and distribution of reference materials. Two of these programs were the Repository for Toxic and Hazardous Materials ("THM") and the Pesticides Repository. In 1989, NSI contracted with EPA to provide support services for both the THM Repository and the Pesticides Repository. The contract covered the period from October 1, 1989, to September 30, 1990, with the government retaining the option to extend the term of the contract for up to four additional annual periods. This contract was awarded in compliance with the federal procurement laws and the Federal Acquisition Regulation.[5]
 
 
 5
 The contract between EPA and NSI provided that the "[THM] Repository contractor [NSI] will produce, test, and distribute analytical reference standards of high-purity for the calibration of measurement instrument systems and tests of analytical methods." Joint Appendix at A-264. Specifically, the contract required NSI to "[s]ynthesize chemicals that are unobtainable, overly expensive, or unavailable in satisfactory pure form ... [and] [p]roduce calibration standards or other special materials by preparing solutions of each chemical and transferring and sealing aliquots in individual glass ampules." Id. at A-264-65. The contract also required NSI to maintain the integrity and purity of bulk stock of THM Repository chemicals, procure additional chemicals, verify the purity and identity of new chemicals stocks, and conduct stability studies on the THM Repository.
 
 
 6
 In 1991, EMSL-CI and NSI entered into a CRADA. Chem Service averred in its amended complaint that the "CRADA between NSI and EMSL-CI authorizes, but does not require, NSI to produce and distribute additional reference samples after the existing ampule inventory is exhausted." Id. at A-177.[6] The CRADA's Statement of Work provides that "EPA is primarily entering into this CRADA to assure the availability of accurate and reliable liquid organic standards for EPA methods.... The standards will come from two sources; those available from the EPA [THM] Repository and those produced by NSI [under the CRADA]." Id. at A-62. Reference materials produced under both the competitive contract with NSI and the CRADA with NSI were intended by EPA to support EPA regulatory methods and agency endorsed monitoring programs. Id. at A-63 & A-264.
 
 
 7
 Prior to the NSI CRADA, EPA provided THM Repository reference materials free of charge to federal laboratories and non-federal parties. The NSI CRADA altered this arrangement. It provided that a one year supply of these reference materials would be provided "to the EPA Family" on a complimentary basis, but after this supply was distributed, NSI was authorized to sell the reference materials. Id. at A-62-66. The CRADA provided that EPA would receive a percentage of the receipts from these sales by NSI, to compensate EPA for the use of equipment and materials provided under the competitive contract, and for research and development. Id. at A-49-50.[7]
 
 
 8
 In addition, prior to finalizing the CRADAs, EMSL-CI began developing specifications for reference material standards in conjunction with the American Association for Laboratory Accreditation ("A2LA"), a private organization. During this period, Chem Service received accreditation by A2LA. Chem Service contends that in order to obtain and maintain its accreditation by A2LA it was, and is, required to submit to rigorous testing by independent laboratories and inspections by A2LA.
 
 
 9
 On June 18, 1991 EMSL-CI and A2LA entered into a Memorandum of Understanding ("MOU"). According to the terms of the MOU, the parties entered this agreement "to establish the relationship between A2LA's Certification Program for Reference Materials and USEPA's Certified Reference Materials which are produced for USEPA by commercial firms under Cooperative Research and Development Agreements." Id. at A-142. The MOU provides that EMSL-CI and A2LA will work together to develop equivalent technical specifications and requirements for reference materials. In addition, the MOU states that the parties agree that the certification program run by each entity with respect to reference materials would contain these equivalent technical specifications. These specifications were later finalized.
 
 
 10
 Chem Service maintains that the MOU commits the defendants to limiting the label "EPA Certified" to reference materials which meet the same technical specifications as "A2LA Certified" standards. Chem Service contends that the defendants allow NSI, Ultra and Spex to sell pre-CRADA, pre-MOU Repository reference materials labeled as "EPA Certified" even though these reference materials were not produced according to the specifications agreed pursuant to the terms of the MOU.
 
 
 11
 Chem Service asserts two grounds for relief. First, Chem Service contends that the production and distribution of reference material by NSI and Spex, under the CRADAs, using technology that was developed and existed prior to the CRADAs, is essentially a government procurement contract that should be governed by the Competition in Contracting Act, Pub.L. No. 98-369, title VII, 98 Stat. 1175, and other government procurement laws.[8] Chem Service asserts that, because the relevant sections of the CRADAs do not involve the research or development of new technology, they exceed the statutory authority provided by the FTTA for technology transfer between federal laboratories and non-federal parties. Chem Service further claims that the marketing of reference materials under the NSI, Spex and Ultra CRADAs is a means of providing government funding of a non-government party in violation of the FTTA.
 
 
 12
 Chem Service's second contention is that its competitors, NSI, Spex and Ultra, are selling products certified by EPA as meeting the same minimum technical specifications as Chem Service's products when the competing products have not in fact been produced to those specifications.
 
 
 13
 Chem Service filed its original complaint in the district court on February 18, 1992. NSI was granted leave to intervene as a defendant in July 1992. After a period of discovery, the government moved to dismiss the complaint or, in the alternative, for a motion in limine, restricting judicial review to the administrative record. NSI filed a similar motion in October. Following these motions, Chem Service filed a brief in reply and a motion for leave to amend its complaint. The defendants withdrew their motions to dismiss, without prejudice. The district court granted Chem Service's motion to amend its complaint, and Chem Service filed its amended complaint on November 5, 1992. Defendants then filed motions to dismiss the amended complaint. On January 11, 1993, the district court granted the defendants' motion, concluding that Chem Service lacked standing to challenge the actions taken by EMSL-CI, its director, and EPA. Chem Service filed a timely Notice of Appeal.
 
 II.
 
 14
 The district court had jurisdiction over this case under 5 U.S.C. Secs. 702, 703, and 704 (1988) and 28 U.S.C. Sec. 1331 (1988). Appellate jurisdiction for this appeal from a final order of the district court is predicated upon 28 U.S.C. Sec. 1291 (1988).
 
 
 15
 A motion to dismiss in accordance with Fed.R.Civ.P. 12(b)(6) may be granted if it appears beyond a doubt that the plaintiff can prove no set of facts to support the relief requested. Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 101-102, 2 L.Ed.2d 80 (1957); Pennsylvania ex rel. Zimmerman v. Pepsico, Inc., 836 F.2d 173, 179 (3d Cir.1988). In deciding such a motion, we must "accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom," Rocks v. Philadelphia, 868 F.2d 644, 645 (3d Cir.1989), and "read the facts alleged in the complaint in the light most favorable to the [non-moving party]." H.J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 249, 109 S.Ct. 2893, 2906, 106 L.Ed.2d 195 (1989). This court's review of the district court's order to dismiss the complaint for lack of standing is plenary. Blasband v. Rales, 971 F.2d 1034, 1040 (3d Cir.1992).
 
 III.
 
 16
 A person who seeks standing to challenge agency action must show (1) injury in fact and (2) that his interest is "arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee" on which the claim is based. Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970). Defendants did not assert in district court or on appeal that Chem Service lacked injury in fact. There is no disagreement that the plaintiff alleges injury in fact, which is required by the constitutional limitation on federal court jurisdiction to actual cases or controversies. Simon v. Eastern Kentucky Welfare Rights Organization, 426 U.S. 26, 37, 96 S.Ct. 1917, 1923, 48 L.Ed.2d 450 (1976).
 
 
 17
 This leads us to consider whether Chem Service satisfies the prudential rules of standing, which consideration involves a determination of whether Chem Service meets the zone of interests requirement. The APA provides that:
 
 
 18
 [a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.
 
 
 19
 5 U.S.C. Sec. 702.
 
 
 20
 To gain standing under this provision, Chem Service must identify some final agency action that affects it; it is judicial review "thereof" to which Chem Service is entitled. Lujan v. National Wildlife Federation, 497 U.S. 871, 882, 110 S.Ct. 3177, 3185, 111 L.Ed.2d 695 (1990). "When ... review is sought not pursuant to specific authorization in the substantive statute, but only under the general provisions of the APA, the 'agency action' in question must be 'final agency action.' " Id. It is undisputed that the CRADAs entered into by EMSL-CI are final agency action for the purposes of our analysis.
 
 
 21
 Chem Service must also show that it is adversely affected or aggrieved by the agency action "within the meaning of the relevant statute." Id. at 883, 110 S.Ct. at 3186. To do so, "the plaintiff must establish that the injury he complained of (his aggrievement, or the adverse effect upon him) falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis of the complaint." Id.
 
 
 22
 The Supreme Court has described the necessary standing inquiry as follows:
 
 
 23
 [t]he "zone of interest" test is a guide for deciding whether, in view of Congress' evident intent to make every agency action presumptively reviewable, a particular plaintiff should be heard to complain of a particular agency decision. In cases where the plaintiff is not itself the subject of the contested regulatory action, the test denies a right of review if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit. The test is not meant to be especially demanding; in particular, there need be no indication of congressional purpose to benefit the would-be plaintiff.
 
 
 24
 Clarke v. Securities Industry Association, 479 U.S. 388, 399-400, 107 S.Ct. 750, 757, 93 L.Ed.2d 757 (1987) (footnotes omitted). In addition, the Court noted that "we are not limited to considering the statute under which respondents sued, but may consider any provision that helps us to understand Congress' overall purposes in the [statute sued under]." Id. at 401, 107 S.Ct. at 758.
 
 
 25
 In applying the zone of interest test, the Court has focused its inquiry on the Congressional intent of the statute and whether the complainant's interests were "among the sorts of interests those statutes were specifically designed to protect." National Wildlife Federation, 497 U.S. at 886, 110 S.Ct. at 3187. "The relevant statute ... is the statute whose violation is the gravamen of the complaint...." Id. at 886, 110 S.Ct. at 3187.
 
 
 26
 Most recently, the Court has taken a stricter view of what statute or statutes should be considered as "relevant" for the purpose of applying the zone of interest test. The Court expressed the concern that too broad a reading "could deprive the zone of interests test of virtually all meaning." Air Courier Conference v. American Postal Workers Union, 498 U.S. 517, 530, 111 S.Ct. 913, 921, 112 L.Ed.2d 1125 (1991).
 
 
 27
 It is with this background in mind that we consider Chem Service's appeal. Chem Service claims a right to judicial review of the CRADAs under the APA. Our task is to determine whether the interests Chem Service alleges have been interfered with are arguably within the zone of the interests that the relevant statute was designed to protect. We need not decide whether those interests are actually protected. That is a question which goes to the merits of the dispute. Investment Company Inst. v. Camp, 401 U.S. 617, 620, 91 S.Ct. 1091, 1093, 28 L.Ed.2d 367 (1971). Our focus is on whether Chem Service's interests are arguably protected. To answer that question we must determine what should be considered the "relevant statute" for purposes of applying the zone of interests test.
 
 
 28
 Defendants have asserted that the court should look no further than the FTTA. The district court agreed and dismissed Chem Service's complaint for lack of standing after concluding that the plaintiff's claimed injury was not within the zone of interest that the FTTA was designed to protect. In doing so, the district court relied solely on its analysis of the FTTA. Based on its interpretation of Air Courier Conference, the district court refused plaintiff's argument that it should consider the FTTA's nexus with the federal procurement laws.
 
 
 29
 We must determine whether the district court erred in focusing its inquiry too narrowly. To do so, we must consider the Supreme Court's decisions in Clarke and Air Courier Conference. These cases represent reference points in helping to determine whether a particular statutory provision is relevant for purposes of the zone of interests test.
 
 
 30
 In Clarke, the Court considered whether the Securities Industry Association ("SIA") had standing to challenge a ruling by the Comptroller of the Currency that approved the application of two national banks to provide discount brokerage services without regard to the limitations imposed by state branching law. The gravamen of SIA's claim was that discount brokerage services offered by a national bank should have been considered by the Comptroller to be a "branch" as that term is defined in 12 U.S.C. Sec. 36(f) and that, as a branch, such services should have been subject to the geographical limitations on banks as provided for under 12 U.S.C. Sec. 36(c). This latter provision provides that national banks can branch to the degree that state banks are permitted to branch by state law.
 
 
 31
 The Comptroller argued that SIA lacked standing because SIA's interests did not fall within the zone of interests Congress intended to protect in enacting the statutory provisions that went to the merits of SIA's complaint (Sec. 36). The Comptroller argued that Congress enacted these provisions not out of concern for securities dealers, but to establish equality between state and national banks.
 
 
 32
 In considering whether SIA was within the zone of interests, the Court looked beyond Sec. 36 to 12 U.S.C. Sec. 81. Prior to the enactment of Sec. 36, national banks were prevented from branching under the limitation imposed by Sec. 81. Clarke, 479 U.S. at 401, 107 S.Ct. at 758. Section 81 was amended to allow national banks to branch under Sec. 36 to the extent that state banks were permitted to branch under state law. In analyzing this series of Congressional actions, the Court held that Congress was concerned not only with equalizing the status of state and national banks but with preventing the perceived dangers of unlimited branching by national banks. Id. at 402, 107 S.Ct. at 758-59. This latter Congressional intent (to prevent unlimited branching) provided the Court with the necessary basis for determining that SIA was within the zone of interests.
 
 
 33
 Placing Sec. 36 in the context of Sec. 81 and subsequent modifications made by the National Bank Act of 1933, the Court found it "significant for our ... inquiry that Congress rejected attempts to [amend federal law to] allow national banks to branch without regard to state law." Id. at 402, 107 S.Ct. at 758. Given these Congressional concerns, the Court held "[t]here is sound reason to infer that Congress 'intended [SIA's] class of plaintiffs to be relied upon to challenge agency disregard for the law.' " Id. at 403, 107 S.Ct. at 759 (quoting Block v. Community Nutrition Institute, 467 U.S. 340, 347, 104 S.Ct. 2450, 2454, 81 L.Ed.2d 270 (1984)). The Court held that SIA, as a competitor who alleged injury if national banks were allowed to provide discount brokerage services without regard to state branching laws, was within the zone of interests Congress sought to protect in enacting the National Bank Act. Thus, SIA had standing to challenge the Comptroller's ruling. "[W]e are not limited to considering the statute under which respondents sued, but may consider any provision that helps us to understand Congress' overall purposes in the National Bank Act." Clarke, 479 U.S. at 401, 107 S.Ct. at 758.
 
 
 34
 In Air Courier Conference, the Court considered whether a union of postal employees had standing to challenge the action of the United States Postal Service in suspending the Private Express Statutes ("PES") to permit private couriers to engage in international remailing. The Court held that the union failed to demonstrate that it was within the zone of interests Congress sought to protect in enacting the PES, which included the maximizing of Postal revenue but not the employment of Postal workers. The Court rejected the union's argument that the relevant statute for determining standing was the entire Postal Reorganization Act ("PRA"), which contained provisions governing both labor-management relations and the PES.
 
 
 35
 In refusing to consider the entire PRA for the purposes of the zone of interests test, the Court distinguished the case from Clarke in which the Court expressed a willingness to consider statutory provisions other than the statute or statutes sued under in helping to understand Congress' intent. In Air Courier Conference, the Court noted that the only relationship between the labor-management provisions of the PRA, upon which the union relied for its claim of standing, and the PES, upon which the union based its claim on the merits, was that "both were included in the general codification of postal statutes embraced in the PRA." 498 U.S. at 529, 111 S.Ct. at 921. "Unlike the two sections of the National Bank Act discussed in Clarke ... none of the provisions of the PES has any integral relationship with the labor management provisions of the PRA." Id. at 530, 111 S.Ct. at 921 (emphasis added). The Court's examination of the legislative history of the PRA revealed no Congressional intent to draw a connection between the PES and the labor-management provisions. Given this analysis, the Court held that it "stretches the zone of interests test too far" to allow the union's standing to challenge the Postal Service's action relaxing the PES. Id.
 
 
 36
 We now turn to the present dispute to determine whether Chem Service is arguably within the zone of interests surrounding the creation of CRADAs. In denying Chem Service standing, the district court performed a review of the FTTA, its purpose and legislative history and concluded that Chem Service did not fall within the Act's "ambit of protection" for the purposes of the zone of interests test.
 
 
 37
 The impetus for the FTTA was Congressional concern that despite the billions of dollars that the federal government spent on research and development at over 700 federal laboratories, only a very small percentage of the 28,000 patents produced by federal laboratories were utilized for commercial purposes. S.Rep. No. 99-283, 99th Cong., 2d Sess. 1-2. (1986), reprinted in 1986 U.S.C.C.A.N. 3442, 3443.
 
 
 38
 The Stevenson-Wydler Technology Innovation Act of 1980, Pub.L. No. 96-480, 94 Stat. 2311, codified as amended at 15 U.S.C. Sec. 3701 et seq. (1988), made transfer of federal technology a national priority. Despite this legislation, federal laboratories still faced problems in trying to transfer technology. Many federal laboratories lacked clear legal authority to enter into cooperative research projects. S.Rep. No. 283 at 3. See also S.Rep. No. 283 at 4, 1986 U.S.C.C.A.N. at 3445 (Federal laboratories "often perceive themselves as unable to enter into cooperative development arrangements because of organizational and legal constraints.... To improve technology transfer, the Federal laboratories need clear authority to do cooperative research, and they need to be able to exercise that authority at the laboratory level.").
 
 
 39
 The FTTA amended the Stevenson-Wydler Act to promote technology transfer by providing government-operated laboratories the clear authority to transfer technology to industry. Among the purposes of the FTTA was "to improve the transfer of commercially useful technologies from the Federal laboratories and into the private sector." S.Rep. No. 283 at 1, 1986 U.S.C.C.A.N. at 3442. To accomplish this goal, Congress established the authority for government-operated laboratories to enter into CRADAs with non-federal parties. 15 U.S.C. Sec. 3710a(a)(1).
 
 
 40
 The district court found that "nowhere in the legislative history or the Act is there any indicia of a Congressional concern for the interests of individual businesses qua competitors. Rather the Act is concerned with improving the nation as a whole so that it may compete globally, not with ensuring the competitive rights of individual domestic companies." There is no doubt, as the district court found, that Congress intended the FTTA to be used to transfer technology from the laboratories and increase the nation's economic competitiveness. Nowhere in the Act did Congress specifically confer a right on private entities to bring suit to challenge a CRADA. But this is not the standard we are required to use in determining whether Chem Service has standing. In a series of cases, the Supreme Court has recognized that Congress does not need to specifically confer a right to bring suit for agency disregard of the law. See Clarke, 479 U.S. at 395 n. 9, 107 S.Ct. at 755 n. 9. All that we must find is that Congress intended for entities possessing interests such as those of Chem Service to be relied upon to challenge the EPA's disregard for the law. Id. at 399, 107 S.Ct. at 757.
 
 
 41
 It is clear from the statute that Congress did not intend that CRADAs be used to circumvent the nation's procurement laws. In our view, the district court did not fully consider the specific language Congress used in defining a CRADA. The FTTA defines a CRADA as an agreement between the laboratory and non-federal party under which each agrees to provide resources[9] "toward the conduct of specific research or development efforts which are consistent with the missions of the laboratory; except that such term does not include a procurement contract or cooperative agreement as those terms are used in sections 6303, 6304, and 6305 of Title 31." 15 U.S.C. Sec. 3710a(d)(1) (emphasis added).
 
 
 42
 In general, federal agencies are required to make purchases and contracts for property and services in accordance with the Federal Property and Administrative Services Act, Pub.L. No. 81-152, 63 Stat. 377, codified as amended at 41 U.S.C. Sec. 251 et seq. (1988), and the Competition in Contracting Act, unless made inapplicable by other law. 41 U.S.C. Sec. 252(a)(2). CRADAs entered into under the FTTA represent such an exception to the usual types of contractual arrangements entered into by the federal government, except to the extent that they are actually a procurement contract, grant agreement, or cooperative agreement as defined by 31 U.S.C. Secs. 6303, 6304, or 6305.
 
 
 43
 We find that the provisions of the FTTA which define a CRADA have an "integral relationship" with the federal procurement laws. As the text of 15 U.S.C. Sec. 3710a(d)(1) makes clear, Congress prohibited laboratories from including within a CRADA an agreement which would otherwise be classified as a procurement contract or cooperative agreement as defined in title 31, United States Code. The legislative history regarding this section confirms our view that Congress did not intend that a CRADA be used to substitute for a procurement contract or cooperative agreement.[10]
 
 
 44
 In reaching this conclusion, we find this case much more analogous to Clarke than to Air Courier Conference. In Clarke, the statute provided a sufficient nexus, as 12 U.S.C. Sec. 36 was itself a limited exception to 12 U.S.C. Sec. 81. In determining that the plaintiff had standing, the Court looked beyond the statute specifically at issue, Sec. 36, to gain an understanding of Congress' intent in passing the legislation. In Air Courier Conference, plaintiffs failed to present a convincing argument that a sufficient nexus existed between the PES and the labor-management provisions of the PRA. In the current dispute, the statutory language, like the statutory language in Clarke, provides a sufficient connection to infer Congress' intent. In defining a CRADA, Congress specifically established a limited exception to the nation's procurement laws. We look to those laws in helping us understand Congress' overall purposes in the enacting the FTTA.
 
 
 45
 The Competition in Contracting Act ("CICA") permits an actual or prospective bidder who alleges a violation of a procurement statute or regulation to challenge the solicitation of a proposed contract or the award of such a contract.[11] See also Merriam v. Kunzig, 476 F.2d 1233 (3d Cir.), cert. denied, 414 U.S. 911, 94 S.Ct. 233, 38 L.Ed.2d 149 (1973) (unsuccessful bidder for award of a lease of government office space had standing to challenge the contracting process). While the FTTA does not require the government to solicit bids for a CRADA, an agreement between the federal government and a non-federal party which manifests the features of a procurement contract requires the federal government to comply with the nation's procurement laws. The 1989 contract between EPA and NSI and the 1991 CRADA between these same parties were both intended to maintain the THM Repository. The Statement of Work under both the contract and the CRADA provides for the production of materials for the THM Repository. There is sufficient similarity in the purposes and requirements of the two contractual relationships that a substantial question has been raised as to whether the CRADA is being used to circumvent the federal procurement laws.[12] It is within this context that we find that Chem Service has standing to challenge the CRADAs.
 
 
 46
 We are not unmindful of the Court's decision in Air Courier Conference to limit the scope of which statutory provisions should be considered relevant for the purposes of the zone of interests test. In this instance, we do not believe that it is a substantial extension to consider the federal procurement laws as relevant in our analysis. The FTTA, in its definition of a CRADA, provides the critical "integral relationship" between the FTTA and the procurement laws that we find sufficient to hold that standing exists. To the extent that a CRADA is used to circumvent the statutory and regulatory requirements of the federal procurement laws, we find that Congress intended potential bidders to such a contract to be within the zone of interests protected under the FTTA.
 
 IV.
 
 47
 Chem Service's second claim is that its competitors, NSI, Spex and Ultra, are selling certain reference materials, which were produced before the CRADAs were entered into but which are certified by the defendants as meeting the same minimum technical specifications required for certification pursuant to the MOU between EMSL-CI and A2LA. Chem Service's products, pursuant to Chem Service's agreement with A2LA, must meet the same certification standards as established under the MOU in order to label their products as "A2LA Certified" or "Certified by A2LA to USEPA specifications." In essence, Chem Service is complaining that its competitors, in selling the pre-CRADA so-called "certified" reference materials, have a competitive advantage over Chem Service because the competing products have not in fact been produced to the specifications developed pursuant to the MOU. Chem Service seeks to enforce the terms of the MOU between EMSL-CI and the A2LA to cover these pre-CRADA reference materials. It contends that it has standing to pursue this claim because, in order to meet A2LA standards and receive a certification for its products, it must comply with the requirements established pursuant to the MOU, even though it is not a party to the MOU.
 
 
 48
 Chem Service seeks to require the defendants to comply with the terms of the MOU. To determine whether Chem Service has standing under the APA to make this claim we must consider whether the MOU represents a final agency action that affects Chem Service; it is judicial review "thereof" to which Chem Service would be entitled. Among the arguments put forth by defendants is that the MOU does not represent final agency action as defined by the APA. If the MOU does represent final agency action, we must also consider whether Chem Service is arguably within the zone of interests Congress intended to protect.
 
 The APA defines an agency rule as:
 
 49
 the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, practice requirements of an agency ...
 
 
 50
 5 U.S.C. Sec. 551(4).
 
 
 51
 The MOU specifically declares its purpose to be "to establish the relationship between A2LA's Certification Program for Reference Materials and USEPA's Certified Reference Materials which are produced for USEPA by commercial firms under Cooperative Research and Development Agreements." JA at A-142. Under the MOU, EMSL-CI and A2LA agreed that they "shall work together to develop equivalent technical specifications and requirements for reference materials. The products must meet these specifications to be certified by the approving party." Id. at A-143. The MOU would appear to fit within the definition of a rule because EPA has entered into a statement of general applicability and future effect designed to implement the FTTA.
 
 
 52
 The question remains whether Chem Service is within the zone of interests Congress sought to protect. Chem Service asserts that it is within the zone of interests as a regulated party because the MOU is binding on its products. However, any regulation felt by Chem Service is voluntary under its agreement with A2LA.
 
 
 53
 In its brief to this Court, Chem Service makes an analogy comparing its situation to one in which a corporation manufacturing aircrafts would have to meet a higher standard of airworthiness relative to its competitor because its competitor was paying the Federal Aviation Administration ("FAA") a percentage on the sale of each airframe. In other words, Chem Service asserts that it has to meet a higher standard to have its reference materials certified relative to its competitors because its competitors are paying EPA a percentage on the sale of each item. Chem Service argues that the first aircraft manufacturer would have standing, under the statutes authorizing the FAA to issue airworthiness certification, to challenge such a double standard. However, there is a critical distinction between the analogy presented by Chem Service and the current dispute. While there is statutory language governing aviation safety, 49 U.S.C.App. Sec. 1425(b), Chem Service fails to point to any similar specific statutory authority pertaining to certification of reference materials. Instead, Chem Service makes reference to statutory language which provides that a person aggrieved by a private inspector delegated by the FAA to certify airworthiness is entitled to review by the agency. 49 U.S.C.App. Sec. 1355(b). However, Chem Service does not point to any similar statutory authority governing its relationship with the private accreditation organization, A2LA. Chem Service is not a regulated party just because it has entered into its own voluntary agreement with A2LA.
 
 
 54
 In Associated Gas Distributors v. FERC, 899 F.2d 1250, 1259 (D.C.Cir.1990), the court held that parties who would benefit from vigorous enforcement of the licensing requirements of the natural gas laws have standing to challenge allegedly illegal exemptions being granted by Federal Energy Regulatory Commission. However, Associated Gas Distributors is distinguishable from the present dispute. In that case, the court was reviewing an agency's broad interpretation of a statute which allowed plaintiff's competitors to be involved in activity detrimental to the plaintiff's economic interests. The court granted standing after finding that the plaintiff's interests were congruent with Congress' intent in enacting the statute. Both were interested in limiting entry into the market, thus plaintiff was within the zone of interests Congress sought to protect. In the present dispute, Chem Service asserts that its competitors have been given favorable treatment by EPA to the detriment of its economic interests. The question is whether there is any relevant statute which would assist Chem Service in gaining standing. Congress' intent in enacting the FTTA was to promote cooperation between federal laboratories and the private sector. This alone would not appear to be enough to find that Chem Service had standing to challenge the defendant's actions under the MOU.[13]
 
 
 55
 Lastly, Chem Service asserts that as a member of "EPA's regulated community" it is entitled to assurance that regulatory action will be done uniformly. Chem Service compares itself to a pilot who was recognized as being within the class of persons intended to be protected by the air worthiness certification process. Arney v. United States, 479 F.2d 653 (9th Cir.1973). However, this argument is distinguishable from the present dispute in that there is a specific statute governing the air worthiness certification process, while Chem Service fails to point to any similar statute governing certification of reference materials. In sum, we hold that Chem Service does not have standing to challenge EPA's actions under the MOU.
 
 
 56
 With regard to Chem Service's first claim, we agreed that it has standing under the FTTA to challenge the CRADAs, after reviewing the FTTA in connection with the federal procurement laws. However, Congress was explicit in its intent that federal laboratories not use CRADAs to by-pass the procurement laws. We do not find any statutory authority comparable with regard to the MOU.
 
 V.
 
 57
 For the foregoing reasons, we hold that Chem Service has standing to challenge the CRADAs based on its first claim. We will reverse the order of the district court dismissing the amended complaint for lack of standing and we will remand this case for further proceedings on this claim in conformance with this opinion. We will affirm the district court's dismissal of the second claim for lack of standing.
 
 
 58
 STAPLETON, Circuit Judge, concurring and dissenting:
 
 
 59
 I, too, conclude that Chem Service has standing under the FTTA to seek a judicial determination that the defendants' agreements are contracts expressly excluded from the authorization of that Act rather than CRADAs authorized thereby. I join Sections I, II and III of the opinion. I am unable to join Section IV, however.
 
 
 60
 I understand Chem Service's second claim to rest on the following understanding of the MOU and its position with respect thereto. In the MOU, the EPA created a regulatory program designed to provide reference material users with a basis for assessing the quality of reference materials offered in the marketplace. As a part of that program, the EPA committed itself to develop minimum quality standards ("specifications"), in collaboration with A2LA, and thereafter to certify only those products as EPA approved which meet those minimum standards. The EPA agreed as part of the program that those products found by A2LA to meet the agreed upon specifications could be represented as "certified by A2LA to USEPA specifications." Chem Service has participated in this program by submitting its products to A2LA and securing its certification that those products meet USEPA specifications.
 
 
 61
 Chem Service alleges that, despite the EPA's commitment under its program to certify only those products that meet the agreed upon specifications, EPA is currently certifying products produced before the MOU that do not meet the agreed upon specifications. It is this practice that Chem Service claims to be an arbitrary and capricious implementation of this regulatory program, one that has inflicted competitive injury upon Chem Service.
 
 
 62
 Chem Service thus alleges that it participated in a certification program which the EPA had sponsored in order to establish standards for reference materials and that, through its participation, it had earned the right to represent its product as meeting the EPA specifications. Despite its reliance on the EPA's commitment under that program and Chem Service's investment in satisfying the EPA standards, Chem Service allegedly now finds itself confronted with a situation in which the EPA is certifying as EPA approved a product that does not meet the standards established in the specifications.
 
 
 63
 Understandably, neither Chem Service nor the defendants assert that the EPA is not authorized to establish minimum standards for a product that can be represented as meeting EPA specifications.[14] Where an agency adopts a regulatory program that it is authorized to adopt and a private party is in the zone of interest which the program is intended to serve, it necessarily follows, I believe, that the party is within the zone of interest of the enabling statute and may challenge the validity of the program or its implementation.
 
 
 64
 One of the primary objectives of the EPA's program is to encourage producers to make the investment necessary to meet its specifications and, to that end, to protect those who are willing to make that investment against producers who are not. Accordingly, it seems clear to me that Chem Service, having participated in the program and having produced reference materials meeting the EPA's specifications, is within the zone of interest of the EPA's program and has standing to challenge the certification of non-conforming products as products meeting the EPA's specifications.
 
 
 65
 I would instruct the district court to entertain Chem Service's second claim.
 
 
 
 [1]
 15 U.S.C. Sec. 3710a(d)(1) provides:
 As used in this section the term "cooperative research and development agreement" means any agreement between one or more Federal laboratories and one or more non-Federal parties under which the Government, through its laboratories, provides personnel, services, facilities, equipment or other resources with or without reimbursement (but not funds to non-Federal parties) and the non-Federal parties provide funds, personnel, services, facilities, equipment, or other resources toward the conduct of specified research or development efforts which are consistent with the missions of the laboratory; except that such term does not include a procurement contract or cooperative agreement as those terms are used in sections 6303, 6304, and 6305 of title 31, United States Code.
 
 
 [2]
 31 U.S.C. Sec. 6303 provides:
 An executive agency shall use a procurement contract as the legal instrument reflecting a relationship between the United States Government and a State, a local government, or other recipient when--
 (1) the principal purpose of the instrument is to acquire (by purchase, lease, or barter) property or services for the direct benefit or use of the United States Government; or
 (2) the agency decides in a specific instance that the use of a procurement contract is appropriate.
 31 U.S.C. Sec. 6304 provides:
 An executive agency shall use a grant agreement as the legal instrument reflecting a relationship between the United States Government and a State, a local government, or other recipient when--
 (1) the principal purpose of the relationship is to transfer a thing of value to the State or local government or other recipient to carry out a public purpose of support or stimulation authorized by a law of the United States instead of acquiring (by purchase, lease, or barter) property or services for the direct benefit or use of the United States Government; and
 (2) substantial involvement is not expected between the executive agency and the State, local government, or other recipient when carrying out the activity contemplated in the agreement.
 31 U.S.C. Sec. 6305 provides:
 An executive agency shall use a cooperative agreement as the legal instrument reflecting a relationship between the United States Government and a State, a local government, or other recipient when--
 (1) the principal purpose of the relationship is to transfer a thing of value to the State, local government, or other recipient to carry out a public purpose of support or stimulation authorized by a law of the United States instead of acquiring (by purchase, lease, or barter) property or services for the direct benefit or use of the United States Government; and
 (2) substantial involvement is expected between the executive agency and the State, local government, or other recipient when carrying out the activity contemplated in the agreement.
 
 
 [3]
 NSI Environmental Solutions, Inc., the defendant intervenor in this action, is the assignee of NSI Technology Services Corporation and has acceded to all of NSI Technology Services Corporation's right, title, and interest in the CRADA between EMSL-CI and NSI Technology Services Corporation. NSI Environmental Solutions, Inc. is the wholly-owned subsidiary of ManTech Environmental Technology, Inc., which is the wholly-owned subsidiary of NSI Technology Services Corporation. For our purposes, "NSI" is a reference to this corporate entity
 
 
 [4]
 Reference materials are materials or substances, one or more properties of which are sufficiently well established to be used for calibration of an apparatus, the assessment of a measurement method, or for assigning values to materials. Reference materials are critical in helping private sector entities demonstrate that they are in compliance with the nation's environmental laws
 
 
 [5]
 The Federal Acquisition Regulation ("FAR"), 48 C.F.R. Sec. 1, et seq. (1992), governs the acquisition of supplies or services by all executive agencies. The FAR covers procurement contracts, but does not cover grants or cooperative agreements as defined by 31 U.S.C. Sec. 6301, et seq. 48 C.F.R. Sec. 2.101 (1992)
 
 
 [6]
 In reviewing an order to dismiss the complaint in accordance with Fed.R.Civ.P. 12(b)(6), we read the facts alleged in the complaint in the light most favorable to the non-moving party. See infra part II
 
 
 [7]
 To the extent that the provisions of the Ultra and Spex CRADAs are not stricken on grounds of confidentiality, they would appear to be essentially the same as those of the NSI CRADA. Id. at A-75-140
 
 
 [8]
 Chem Service also contended in its Amended Complaint, but not in its briefing before this court, that this aspect of the CRADAs violated the Advertising Act, 41 U.S.C. Sec. 5 (1988), the Government Contracts Act, 41 U.S.C. Sec. 35 et seq. (1988), and the Federal Acquisition Regulations, 48 C.F.R. Sec. 1, et seq. (1992)
 
 
 [9]
 The laboratory can provide personnel, services, facilities, equipment or other resources with or without reimbursement (but not funds to non-Federal parties) and the non-Federal parties can provide funds, personnel, services, facilities, equipment, or other resources. 15 U.S.C. Sec. 3710a(d)(1)
 
 
 [10]
 Although the Senate Committee Report accompanying H.R. 3773, the Federal Technology Transfer Act, stated that "[m]ost of the cooperative arrangements and patent assignments are expected to be forms of cooperative agreements as established by section 6305 of title 31, United States Code," S.Rep. No. 99-283, 99th Cong., 2d. Sess. 11 (1986), 1986 U.S.C.C.A.N. 3453, this appears to be a typographical error that was corrected when the legislation was considered by the Senate. During consideration of the FTTA, Senator Gorton stated: "Let me also note one error in the [Senate] committee report which may be misleading. Section 5 of the bill defines cooperative research and development arrangements as not including a procurement contract or cooperative agreement as those terms are used in sections 6303, 6304, and 6305 of title 31, United States Code. The report, in its discussion of this section on page 11, inadvertently left out the word 'not.' " Vol. 132 Cong.Rec. S11094 (daily ed. Aug. 9, 1986) (statement of Sen. Gorton)
 
 
 [11]
 Under the CICA, the General Accounting Office ("GAO") considers protests by actual or prospective bidders. 31 U.S.C. Sec. 3551, et seq. (1988). The GAO generally does not review the award of cooperative agreements, unless there is some threshold showing that the cooperative agreement was used where a procurement contract is required. See Matter of: Resource Development Program & Services, Inc., No. B-235331, 89-1 CPD P471, 1989 WL 240784 (Comp.Gen. May 16, 1989); Matter of: Civic Action Institute, 61 Comp.Gen. 637 (1982). Protesters must allege and show that "a cooperative agreement [was] used instead of a procurement contract to avoid the competitive requirements of procurement laws or that a conflict of interest exists." Matter of: Management Development Corporation, 64 Comp.Gen. 669 (1985). Ultimately, the question is whether the principle purpose of the contract is to acquire property or services for the direct benefit or use of the federal government, or to transfer a thing of value to the recipient to carry out a public purpose of support or stimulation authorized by a law. 31 U.S.C. Secs. 6303 and 6305. If the former, then a federal agency is required to utilize a procurement contract and comply with the federal procurement laws
 
 
 [12]
 In addition, to the extent that EPA has provided NSI, Ultra and Spex with reference materials for their sale in return for a percentage of the net revenues, a question is raised as to whether this exceeds the authority provided by the FTTA, which is primarily intended to encourage cooperative research and development efforts. This arrangement also raises the question of whether the sale of this reference material is a means of providing government funding in violation of the FTTA's prohibition on government funding
 
 
 [13]
 In reaching this conclusion, we need not address the government's argument that Chem Service lacked standing because the reference materials were produced prior to the CRADAs and thus are not covered by the MOU
 
 
 [14]
 Pursuant to Title 5, Chapter 9, of the United States Code, President Nixon transferred to the EPA statutory authority for a variety of governmental research, monitoring and standard setting activities regarding toxic substances, as well as authority to perform functions incidental to these activities. Reorganization Plan No. 3 of 1970, 35 Fed.Reg. 15623, reprinted in 5 U.S.C. app. at 1343 (1988) and 42 U.S.C. at 965 (1988), as amended by Pub.L. No. 98-80, 97 Stat. 485; see also 40 C.F.R. Sec. 1.3. The EPA also has been directed by Congress to "carry out [the Toxic Substances Control Act] in a reasonable and prudent manner." 15 U.S.C. Sec. 2601. In particular, the EPA is required to "conduct such research, development and monitoring as is necessary to carry out the purposes of" that Act and to "establish ... monitoring techniques and instruments which may be used in the detection of toxic chemical substances and mixtures and which are reliable, economical, and capable of being implemented under a wide variety of conditions." 15 U.S.C. Secs. 2609(a) and (d). Reorganization Plan No. 3 of 1970 and the Toxic Substance Control Act thus provide ample authority for the EPA to establish a quality control program for reference materials